202 F.3d 489 (2nd Cir. 2000)
 SPORTY'S FARM L.L.C., Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,
v.
SPORTSMAN'S MARKET, INC., Defendant-Third-Party-Plaintiff- Counter-Claimant- Appellee-Cross-Appellant,
OMEGA ENGINEERING, INC., Third-Party-Defendant- Appellee.
 Docket Nos. 98-7452 (L), 98-7538 (XAP)
August Term, 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: March 17, 1999
Decided: Feb. 2, 2000
 
 Appeal from a judgment of the United States District Court for the District of Connecticut (Alfred V. Covello, Chief Judge) finding that Sporty's Farm violated the Federal Trademark Dilution Act, 15 U.S.C. 1125(c), and enjoining Sporty's Farm from using the Internet domain name "sportys.com."
 Affirmed.[Copyrighted Material Omitted]
 JAMES R. FOGARTY, Kirlin, Fogarty Cohen Selby & Nemiroff, Greenwich, CT (W. James Cousins, McGowan & Cousins, P.C., Wilton, CT, on the brief), for Plaintiff-Counter-Defendant-Appellant-Cross-Appellee.
 JAMES SICILIAN, Day, Berry & Howard LLP, Hartford, CT (Peter M. Holland, Day, Berry & Howard, on the brief, and William H. Anderson, General Counsel of Sportsman's Market, Inc., Batavia, OH, of counsel), for Defendant-Third-Party-Plaintiff-Counter-Claimant-Appellee-Cross-Appellant.
 Before: OAKES, CALABRESI, and GIBSON,* Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 This case originally involved the application of the Federal Trademark Dilution Act ("FTDA") to the Internet. See Federal Trademark Dilution Act of 1995, Pub. L. No. 104-98, 109 Stat. 985 (codified at 15 U.S.C. 1125, 1127 (Supp. 1996)). While the case was pending on appeal, however, the Anticybersquatting Consumer Protection Act ("ACPA"), Pub. L. No. 106-113 (1999), see H.R. Rep. No. 106-479 (Nov. 18, 1999), was passed and signed into law. That new law applies to this case.
 
 
 2
 Plaintiff-Counter-Defendant-Appellant-Cross-Appellee Sporty's Farm L.L.C. ("Sporty's Farm") appeals from a judgment, following a bench trial, of the United States District Court for the District of Connecticut (Alfred V. Covello, Chief Judge) dated March 13, 1998. Defendant-Third-Party-Plaintiff-Counter-Claimant-Appellee-Cross-Appellant Sportsman's Market, Inc. ("Sportsman's") cross-appeals from the same judgment.
 
 
 3
 The district court held: (1) that the Sportsman's trademark ("sporty's") was a famous mark entitled to protection under the FTDA; (2) that Sporty's Farm and its parent company, Third-Party-Defendant-Appellee Omega Engineering, Inc. ("Omega"), diluted the sporty's mark by using the Internet domain name "sportys.com" to sell Christmas trees and by preventing Sportsman's from using its trademark as a domain name; (3) that applying the FTDA to Sporty's Farm through an injunction requiring it to relinquish sportys.com was both equitable and not a retroactive application of the statute; (4) that Sportsman's was limited to injunctive relief since the conduct of Sporty's Farm and Omega did not constitute a willful intent to dilute under the FTDA; and (5) that Sporty's Farm and Omega did not violate the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. Ann. 42-110a to 42-110q (West 1992 & Supp. 1999). We apply the new anticybersquatting law and affirm the judgment in all respects, but, given the new law, on different grounds from those relied upon by the district court.
 
 BACKGROUND
 
 4
 * Although the Internet is on its way to becoming a familiar aspect in our daily lives, it is well to begin with a brief explanation of how it works. The Internet (or "World Wide Web") is a network of computers that allows a user to gain access to information stored on any other computer on the network. Information on the Internet is lodged on files called web pages, which can include printed matter, sound, pictures, and links to other web pages. An Internet user can move from one page to another with just the click of a mouse.[1]
 
 
 5
 Web pages are designated by an address called a domain name. A domain name consists of two parts: a top level domain and a secondary level domain. The top level domain is the domain name's suffix. Currently, the Internet is divided primarily into six top level domains: (1) .edu for educational institutions; (2) .org for non-governmental and non-commercial organizations; (3) .gov for governmental entities; (4) .net for networks; (5) .com for commercial users, and (6) a nation-specific domain, which is .us in the United States. The secondary level domain is the remainder of the address, and can consist of combinations of letters, numbers, and some typographical symbols.[2] To take a simple example, in the domain name "cnn.com," cnn ("Cable News Network") represents the secondary level domain and .com represents the top level domain. Each domain name is unique.
 
 
 6
 Over the last few years, the commercial side of the Internet has grown rapidly. Web pages are now used by companies to provide information about their products in a much more detailed fashion than can be done through a standard advertisement. Moreover, many consumers and businesses now order goods and services directly from company web pages. Given that Internet sales are paperless and have lower transaction costs than other types of retail sales, the commercial potential of this technology is vast.
 
 
 7
 For consumers to buy things or gather information on the Internet, they need an easy way to find particular companies or brand names. The most common method of locating an unknown domain name is simply to type in the company name or logo with the suffix .com.[3] If this proves unsuccessful, then Internet users turn to a device called a search engine.[4] A search engine will find all web pages on the Internet with a particular word or phrase. Given the current state of search engine technology, that search will often produce a list of hundreds of web sites through which the user must sort in order to find what he or she is looking for. As a result, companies strongly prefer that their domain name be comprised of the company or brand trademark and the suffix .com. See H.R. Rep. No. 106-412, at 5 (1999).
 
 
 8
 Until recently, domain names with the .com top level domain could only be obtained from Network Solutions, Inc. ("NSI"). Now other registrars may also assign them. But all these registrars grant such names primarily on a first-come, first-served basis upon payment of a small registration fee. They do not generally inquire into whether a given domain name request matches a trademark held by someone other than the person requesting the name. See id.
 
 
 9
 Due to the lack of any regulatory control over domain name registration, an Internet phenomenon known as "cybersquatting" has become increasingly common in recent years.[5] See, e.g., Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998). Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners. Since domain name registrars do not check to see whether a domain name request is related to existing trademarks, it has been simple and inexpensive for any person to register as domain names the marks of established companies. This prevents use of the domain name by the mark owners, who not infrequently have been willing to pay "ransom" in order to get "their names" back. See H.R. Rep. No. 106-412, at 5-7; S. Rep. No. 106-140, at 4-7 (1999).
 
 II
 
 10
 Sportsman's is a mail order catalog company that is quite well-known among pilots and aviation enthusiasts for selling products tailored to their needs. In recent years, Sportsman's has expanded its catalog business well beyond the aviation market into that for tools and home accessories. The company annually distributes approximately 18 million catalogs nationwide, and has yearly revenues of about $50 million. Aviation sales account for about 60% of Sportsman's revenue, while non-aviation sales comprise the remaining 40%.
 
 
 11
 In the 1960s, Sportsman's began using the logo "sporty" to identify its catalogs and products. In 1985, Sportsman's registered the trademark sporty's with the United States Patent and Trademark Office. Since then, Sportsman's has complied with all statutory requirements to preserve its interest in the sporty's mark. Sporty's appears on the cover of all Sportsman's catalogs; Sportsman's international toll free number is 1-800-4sportys; and one of Sportsman's domestic toll free phone numbers is 1-800-Sportys. Sportsman's spends about $10 million per year advertising its sporty's logo.
 
 
 12
 Omega is a mail order catalog company that sells mainly scientific process measurement and control instruments. In late 1994 or early 1995, the owners of Omega, Arthur and Betty Hollander, decided to enter the aviation catalog business and, for that purpose, formed a wholly-owned subsidiary called Pilot's Depot, LLC ("Pilot's Depot"). Shortly thereafter, Omega registered the domain name sportys.com with NSI. Arthur Hollander was a pilot who received Sportsman's catalogs and thus was aware of the sporty's trademark.
 
 
 13
 In January 1996, nine months after registering sportys.com, Omega formed another wholly-owned subsidiary called Sporty's Farm and sold it the rights to sportys.com for $16,200. Sporty's Farm grows and sells Christmas trees, and soon began advertising its Christmas trees on a sportys.com web page. When asked how the name Sporty's Farm was selected for Omega's Christmas tree subsidiary, Ralph S. Michael, the CEO of Omega and manager of Sporty's Farm, explained, as summarized by the district court, that
 
 
 14
 in his own mind and among his family, he always thought of and referred to the Pennsylvania land where Sporty's Farm now operates as Spotty's farm. The origin of the name . . . derived from a childhood memory he had of his uncle's farm in upstate New York. As a youngster, Michael owned a dog named Spotty. Because the dog strayed, his uncle took him to his upstate farm. Michael thereafter referred to the farm as Spotty's farm. The name Sporty's Farm was . . . a subsequent derivation.
 
 
 15
 Joint Appendix ("JA") at 277 (emphasis added). There is, however, no evidence in the record that Hollander was considering starting a Christmas tree business when he registered sportys.com or that Hollander was ever acquainted with Michael's dog Spotty.
 
 
 16
 In March 1996, Sportsman's discovered that Omega had registered sportys.com as a domain name. Thereafter, and before Sportsman's could take any action, Sporty's Farm brought this declaratory action seeking the right to continue its use of sportys.com. Sportsman's counterclaimed and also sued Omega as a third-party defendant for, inter alia, (1) trademark infringement, (2) trademark dilution pursuant to the FTDA, and (3) unfair competition under state law. Both sides sought injunctive relief to force the other to relinquish its claims to sportys.com. While this litigation was ongoing, Sportsman's used "sportys-catalogs.com" as its primary domain name.
 
 
 17
 After a bench trial, the court rejected Sportsman's trademark infringement claim and all related claims that are based on a "likelihood of [consumer] confusion" since "the parties operate wholly unrelated businesses [and t]herefore, confusion in the marketplace is not likely to develop."[6] Id. at 282-83. But on Sportsman's trademark dilution action, where a likelihood of confusion was not necessary, the district court found for Sportsman's. The court concluded (1) that sporty's was a famous mark entitled to protection under the FTDA since "the 'Sporty's' mark enjoys general name recognition in the consuming public,"id. at 288, and (2) that Sporty's Farm and Omega had diluted sporty's because "registration of the 'sportys.com' domain name effectively compromises Sportsman's Market's ability to identify and distinguish its goods on the Internet . . . . [by] preclud[ing] Sportsman's Market from using its 'unique identifier,'" id. at 289. The court also held, however, that Sportsman's could only get injunctive relief and was not entitled to "punitive damages . . . profits, and attorney's fees and costs" pursuant to the FTDA since Sporty Farm and Omega's conduct did not constitute willful dilution under the FTDA.[7] Id. at 292-93.
 
 
 18
 Finally, the district court ruled that, although Sporty's Farm had violated the FTDA, its conduct did not constitute a violation of CUTPA. This conclusion was based on the district court's finding that Sportsman's had failed to show by a preponderance of the evidence (1) that Sporty's Farm and Omega's "conduct was immoral, unethical, oppressive, or unscrupulous," and (2) that Sportsman's "suffered a substantial injury sufficient to establish a CUTPA claim." Id. at 291-92.
 
 
 19
 The district court then issued an injunction forcing Sporty's Farm to relinquish all rights to sportys.com. And Sportsman's subsequently acquired the domain name. Both Sporty's Farm and Sportsman's appeal.[8] Specifically, Sporty's Farm appeals the judgment insofar as the district court granted an injunction in favor of Sportsman's for the use of the domain name. Sportsman's, on the other hand, in addition to urging this court to affirm the district court's injunction, cross-appeals, quite correctly as a procedural matter, the district court's denial of damages under both the FTDA and CUPTA. See 16A Charles Alan Wright et al., Federal Practice and Procedure 3974.4 (3d ed. 1999) ("[A] crossappeal is required to support modification of the judgment . . . .").
 
 III
 
 20
 As we noted above, while this appeal was pending, Congress passed the ACPA. That law was passed "to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks - a practice commonly referred to as 'cybersquatting'." S. Rep. No. 106-140, at 4. In particular, Congress viewed the legal remedies available for victims of cybersquatting before the passage of the ACPA as "expensive and uncertain." H.R. Rep. No. 106-412, at 6. The Senate made clear its view on this point:
 
 
 21
 While the [FTDA] has been useful in pursuing cybersquatters, cybersquatters have become increasingly sophisticated as the case law has developed and now take the necessary precautions to insulate themselves from liability. For example, many cybersquatters are now careful to no longer offer the domain name for sale in any manner that could implicate liability under existing trademark dilution case law. And, in cases of warehousing and trafficking in domain names, courts have sometimes declined to provide assistance to trademark holders, leaving them without adequate and effective judicial remedies. This uncertainty as to the trademark law's application to the Internet has produced inconsistent judicial decisions and created extensive monitoring obligations, unnecessary legal costs, and uncertainty for consumers and trademark owners alike.
 
 
 22
 S. Rep. No. 106-140, at 7. In short, the ACPA was passed to remedy the perceived shortcomings of applying the FTDA in cybersquatting cases such as this one.
 
 
 23
 The new act accordingly amends the Trademark Act of 1946, creating a specific federal remedy for cybersquatting. New 15 U.S.C. 1125(d)(1)(A) reads:
 
 
 24
 A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person -
 
 
 25
 (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
 
 
 26
 (ii) registers, traffics in, or uses a domain name that -
 
 
 27
 (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
 
 
 28
 (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . .
 
 
 29
 The Act further provides that "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark," 15 U.S.C. 1125(d)(1)(C), if the domain name was "registered before, on, or after the date of the enactment of this Act," Pub. L. No. 106-113, 3010. It also provides that damages can be awarded for violations of the Act,[9] but that they are not "available with respect to the registration, trafficking, or use of a domain name that occurs before the date of the enactment of this Act." Id.
 
 DISCUSSION
 
 30
 This case has three distinct features that are worth noting before we proceed further. First, our opinion appears to be the first interpretation of the ACPA at the appellate level. Second, we are asked to undertake the interpretation of this new statute even though the district court made its ruling based on the FTDA. Third, the case before us presents a factual situation that, as far as we can tell, is rare if not unique: A Competitor X of Company Y has registered Y's trademark as a domain name and then transferred that name to Subsidiary Z, which operates a business wholly unrelated to Y. These unusual features counsel that we decide no more than is absolutely necessary to resolve the case before us.
 
 A. Application of the ACPA to this Case
 
 31
 The first issue before us is whether the ACPA governs this case. The district court based its holding on the FTDA since the ACPA had not been passed when it made its decision. Because the ACPA became law while this case was pending before us, we must decide how its passage affects this case. As a general rule, we apply the law that exists at the time of the appeal. See, e.g., Hamm v. City of Rock Hill, 379 U.S. 306, 312-13 (1964) ("'[I]f subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.'" (quoting United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 110 (1801))).
 
 
 32
 But even if a new law controls, the question remains whether in such circumstances it is more appropriate for the appellate court to apply it directly or, instead, to remand to the district court to enable that court to consider the effect of the new law. We therefore asked for additional briefing from the parties regarding the applicability of the ACPA to the case before us. After receiving those briefs and fully considering the arguments there made, we think it is clear that the new law was adopted specifically to provide courts with a preferable alternative to stretching federal dilution law when dealing with cybersquatting cases. Indeed, the new law constitutes a particularly good fit with this case. Moreover, the findings of the district court, together with the rest of the record, enable us to apply the new law to the case before us without difficulty. Accordingly, we will do so and forego a remand.
 
 
 33
 B. "Distinctive" or "Famous"
 
 
 34
 Under the new Act, we must first determine whether sporty's is a distinctive or famous mark and thus entitled to the ACPA's protection. See 15 U.S.C. 1125(d)(1)(A)(ii)(I), (II). The district court concluded that sporty's is both distinctive and famous. We agree that sporty's is a "distinctive" mark. As a result, and without casting any doubt on the district court's holding in this respect, we need not, and hence do not, decide whether sporty's is also a "famous" mark.[10]
 
 
 35
 Distinctiveness refers to inherent qualities of a mark and is a completely different concept from fame. A mark may be distinctive before it has been used - when its fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness. See Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215-26 (2d Cir. 1999). We have no doubt that sporty's, as used in connection with Sportsman's catalogue of merchandise and advertising, is inherently distinctive. Furthermore, Sportsman's filed an affidavit under 15 U.S.C. 1065 that rendered its registration of the sporty's mark incontestable, which entitles Sportsman's "to a presumption that its registered trademark is inherently distinctive." Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 545 (1st Cir. 1995). We therefore conclude that, for the purposes of 1125(d)(1)(A)(ii)(I), the sporty's mark is distinctive.
 
 
 36
 C. "Identical and Confusingly Similar"
 
 
 37
 The next question is whether domain name sportys.com is "identical or confusingly similar to" the sporty's mark.[11] 15 U.S.C. 1125(d)(1)(A)(ii)(I). As we noted above, apostrophes cannot be used in domain names. See supra note 2. As a result, the secondary domain name in this case (sportys) is indistinguishable from the Sportsman's trademark (sporty's). Cf. Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1055 (9th Cir. 1999) (observing that the differences between the mark "MovieBuff" and the domain name "moviebuff.com" are "inconsequential in light of the fact that Web addresses are not caps-sensitive and that the '.com' top-level domain signifies the site's commercial nature"). We therefore conclude that, although the domain name sportys.com is not precisely identical to the sporty's mark, it is certainly "confusingly similar" to the protected mark under 1125(d)(1)(A)(ii)(I). Cf. Wella Corp. v. Wella Graphics, Inc. 874 F. Supp. 54, 56 (E.D.N.Y. 1994) (finding the new mark "Wello" confusingly similar to the trademark "Wella").
 
 
 38
 D. "Bad Faith Intent to Profit"
 
 
 39
 We next turn to the issue of whether Sporty's Farm acted with a "bad faith intent to profit" from the mark sporty's when it registered the domain name sportys.com. 15 U.S.C. 1125(d)(1)(A)(i). The statute lists nine factors to assist courts in determining when a defendant has acted with a bad faith intent to profit from the use of a mark.[12] But we are not limited to considering just the listed factors when making our determination of whether the statutory criterion has been met. The factors are, instead, expressly described as indicia that "may" be considered along with other facts. Id. 1125(d)(1)(B)(i).
 
 
 40
 We hold that there is more than enough evidence in the record below of "bad faith intent to profit" on the part of Sporty's Farm (as that term is defined in the statute), so that "no reasonable factfinder could return a verdict against" Sportsman's. Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999). First, it is clear that neither Sporty's Farm nor Omega had any intellectual property rights in sportys.com at the time Omega registered the domain name. See id. 1125(d)(1)(B)(i)(I). Sporty's Farm was not formed until nine months after the domain name was registered, and it did not begin operations or obtain the domain name from Omega until after this lawsuit was filed. Second, the domain name does not consist of the legal name of the party that registered it, Omega. See id. 1125(d)(1)(B)(i)(II). Moreover, although the domain name does include part of the name of Sporty's Farm, that entity did not exist at the time the domain name was registered.
 
 
 41
 The third factor, the prior use of the domain name in connection with the bona fide offering of any goods or services, also cuts against Sporty's Farm since it did not use the site until after this litigation began, undermining its claim that the offering of Christmas trees on the site was in good faith. See id. 1125(d)(1)(B)(i)(III). Further weighing in favor of a conclusion that Sporty's Farm had the requisite statutory bad faith intent, as a matter of law, are the following: (1) Sporty's Farm does not claim that its use of the domain name was "noncommercial" or a "fair use of the mark," see id. 1125(d)(1)(B)(i)(IV), (2) Omega sold the mark to Sporty's Farm under suspicious circumstances, see Sporty's Farm v. Sportsman's Market, No. 96CV0756 (D. Conn. Mar. 13, 1998), reprinted in Joint Appendix at A277 (describing the circumstances of the transfer of sportys.com); 15 U.S.C. 1125(d)(1)(B)(i)(VI), and, (3) as we discussed above, the sporty's mark is undoubtedly distinctive, see id. 1125(d)(1)(B)(i)(IX).
 
 
 42
 The most important grounds for our holding that Sporty's Farm acted with a bad faith intent, however, are the unique circumstances of this case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute. We know from the record and from the district court's findings that Omega planned to enter into direct competition with Sportsman's in the pilot and aviation consumer market. As recipients of Sportsman's catalogs, Omega's owners, the Hollanders, were fully aware that sporty's was a very strong mark for consumers of those products. It cannot be doubted, as the court found below, that Omega registered sportys.com for the primary purpose of keeping Sportsman's from using that domain name. Several months later, and after this lawsuit was filed, Omega created another company in an unrelated business that received the name Sporty's Farm so that it could (1) use the sportys.com domain name in some commercial fashion, (2) keep the name away from Sportsman's, and (3) protect itself in the event that Sportsman's brought an infringement claim alleging that a "likelihood of confusion" had been created by Omega's version of cybersquatting. Finally, the explanation given for Sporty's Farm's desire to use the domain name, based on the existence of the dog Spotty, is more amusing than credible. Given these facts and the district court's grant of an equitable injunction under the FTDA, there is ample and overwhelming evidence that, as a matter of law, Sporty's Farm's acted with a "bad faith intent to profit" from the domain name sportys.com as those terms are used in the ACPA.[13] See Luciano v. Olsten Corp., 110 F.3d 210, 214 (2d Cir. 1997) (stating that, as a matter of law, judgment may be granted where "the evidence in favor of the movant is so overwhelming that 'reasonable and fair minded [persons] could not arrive at a verdict against [it].'" (quoting Cruz v. Local Union No. 3, 34 F.3d 1148, 1154 (2d Cir. 1994) (alteration in original)).
 
 E. Remedy
 
 43
 Based on the foregoing, we hold that under 1125(d)(1)(A), Sporty's Farm violated Sportsman's statutory rights by its use of the sportys.com domain name.[14] The question that remains is what remedy is Sportsman's entitled to. The Act permits a court to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark," 1125(d)(1)(C) for any "domain name[] registered before, on, or after the date of the enactment of [the] Act," Pub. L. No. 106-113, 3010. That is precisely what the district court did here, albeit under the pre-existing law, when it directed a) Omega and Sporty's Farm to release their interest in sportys.com and to transfer the name to Sportsman's, and b) permanently enjoined those entities from taking any action to prevent and/or hinder Sportsman's from obtaining the domain name. That relief remains appropriate under the ACPA. We therefore affirm the district court's grant of injunctive relief.
 
 
 44
 We must also determine, however, if Sportsman's is entitled to damages either under the ACPA or pre-existing law. Under the ACPA, damages are unavailable to Sportsman's since sportys.com was registered and used by Sporty's Farm prior to the passage of the new law. See id. (stating that damages can be awarded for violations of the Act but that they are not "available with respect to the registration, trafficking, or use of a domain name that occurs before the date of the enactment of this Act.").
 
 
 45
 But Sportsman's might, nonetheless, be eligible for damages under the FTDA since there is nothing in the ACPA that precludes, in cybersquatting cases, the award of damages under any pre-existing law. See 15 U.S.C 1125(d)(3) (providing that any remedies created by the new act are "in addition to any other civil action or remedy otherwise applicable"). Under the FTDA, "[t]he owner of the famous mark shall be entitled only to injunctive relief unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark." Id. 1125(c)(2) (emphasis added). Accordingly, where willful intent to dilute is demonstrated, the owner of the famous mark is - subject to the principles of equity - entitled to recover (1) damages (2) the dilutor's profits, and (3) costs. See id.; see also id. 1117(a) (specifying remedies).
 
 
 46
 We conclude, however, that damages are not available to Sportsman's under the FTDA. The district court found that Sporty's Farm did not act willfully. We review such findings of "willfulness" by a district court for clear error. See Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995). Thus, even assuming the sporty's mark to be famous, we cannot say that the district court clearly erred when it found that Sporty's Farm's actions were not willful. To be sure, that question is a very close one, for the facts make clear that, as a Sportsman's customer, Arthur Hollander (Omega's owner) was aware of the significance of the sporty's logo. And the idea of creating a Christmas tree business named Sporty's Farm, allegedly in honor of Spotty the dog, and of giving that business the sportys.com domain name seems to have occurred to Omega only several months after it had registered the name. Nevertheless, given the uncertain state of the law at the time that Sporty's Farm and Omega acted, we cannot say that the district court clearly erred in finding that their behavior did not amount to willful dilution. It follows that Sportsman's is not entitled to damages under the FTDA.
 
 
 47
 Sportsman's also argues that it is entitled to damages under state law. Because neither the FTDA nor the ACPA preempts state remedies such as CUTPA, damages under Connecticut law are not barred, and hence may be available to Sportsman's. See H.R. Rep. No. 104-374, at 4 (1995), reprinted in 1996 U.S.C.C.A.N. 1029, 1031; 15 U.S.C. 1125(d)(3).
 
 
 48
 CUTPA, Conn. Gen. Stat. Ann. 42-110b(a) (West Supp. 1999), states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In construing this statute, the Connecticut courts have applied the so-called "cigarette rule"[15] which asks:
 
 
 49
 (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen] . . . .
 
 
 50
 All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . .
 
 
 51
 Saturn Constr. Co. v. Premier Roofing Co., 238 Conn. 293, 310-11, 680 A.2d 1274, 1283 (1996) (internal quotation marks omitted).
 
 
 52
 We have no doubt that an ACPA violation meets the requirements of prong one of the cigarette rule test. But, despite our finding that Sporty's Farm acted with a bad faith intent, we do not think that its conduct meets prong two. While Sporty's Farm and Omega intended to do what they did, until today's holding interpreting the new ACPA, the line between business tactics with respect to domain name use that were unfair and those that, if hard-nosed, were nonetheless legitimate was blurry. Under the circumstances, we do not believe that the district court erred when it found that their conduct should not retrospectively be termed "immoral, unethical, oppressive, or unscrupulous." Moreover, prong three also cuts against a violation of CUTPA. Although the use of sportys.com and Sportsman's inability to use its trademark as a domain name injured Sportsman's, we cannot say that the record supports the additional contention that this injury was substantial enough to meet CUTPA's requirements.
 
 
 53
 This does not, however, end our inquiry since the three prongs of the cigarette rule test need not all be met to find that unfair competition took place. Nevertheless, after weighing the cigarette rule factors, we conclude - as the district court did - that the actions of Sporty's Farm and Omega did not contravene CUTPA. Although the removal of sportys.com from Sportsman's was designed to give Omega what we would now deem to be an unfair competitive advantage, we cannot say that this behavior was so unseemly at the time it occurred that Sporty's Farm and Omega should be found liable under state law.
 
 
 54
 In sum, then, we hold that the injunction issued by the district court was proper under the new anticybersquatting law, but that damages are not available to Sportsman's under the ACPA, the FTDA, or CUTPA.F. Retroactivity
 
 
 55
 Sporty Farm's also contends that even if its actions would today violate the FTDA or the ACPA, any injunction requiring it to relinquish use of sportys.com is impermissibly retroactive.[16] We find Sporty's Farm's position to be meritless.
 
 
 56
 In Landgraf v. USI Film Prods., 511 U.S. 244, 273 (1994), the Supreme Court stated: "application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." In Viacom Inc. v. Ingram Enterprises, Inc., 141 F.3d 886, 889 (8th Cir. 1998), the Eighth Circuit reasoned that trademark dilution was a continuing wrong, and therefore relief sought under the FTDA was prospective under Landgraf even if the use of the trademark began before the enactment of the statute. See United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 342 (1897) ("Assuming such action to have been legal at the time the agreement was first entered into, the continuation of the agreement, after it has been declared to be illegal, becomes a violation of [law]."). Similarly, the injunction that was issued in this case provided only prospective relief to Sportsman's. Since it did no more than avoid the continuing harm that would result from Sporty's Farm's use the domain name, there is no retroactivity problem.[17]
 
 CONCLUSION
 
 57
 The judgment of the district court is AFFIRMED in all particulars.
 
 
 
 Notes:
 
 
 *
 The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 
 
 [1]
 A mouse is a device that allows a computer user to issue commands by moving a marker across the screen and then clicking on the symbol, word, or icon that represents the particular information that the user wants to access.
 
 
 [2]
 Certain symbols, such as apostrophes ('), cannot be used in a domain name.
 
 
 [3]
 Nothing prevents an American commercial entity from seeking to use the .org or .us top level domains, but, especially in the United States, it has become customary for commercial web pages to use .com.
 
 
 [4]
 Undoubtedly, there are many people who use a search engine before typing in a company name plus .com. The manner in which users search the Internet depends on how quickly they think the search engine is likely to locate the desired web page.
 
 
 [5]
 "Cyber" is the prefix used to denote Internet-related things. The realm of the Internet is often referred to as "cyberspace."
 
 
 [6]
 The district court also rejected Sportsman's federal actions for false designation and unfair competition on the same rationale. These rulings have not been appealed.
 
 
 [7]
 The FTDA does not provide for punitive damages. It does, however, contemplate treble damages. See 15 U.S.C. 1125(c)(2); 1117(b).
 
 
 [8]
 Omega has not appealed since it prevailed on all the claims made against it by Sportsman's.
 
 
 [9]
 The new Act permits a plaintiff to "elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." Pub. L. No. 106-113, 3003. If the plaintiff does not so elect, the court may award damages under 15 U.S.C. 1117(a) and (b), based on damages, profits, and the cost of the action. See id.
 
 
 [10]
 In most respects, sporty's meets the rigorous criteria laid out in 1125(c)(1), requiring both fame and distinctiveness for protection under the FTDA. See Nabisco Brands, Inc., v. PF Brands, Inc., 191 F.3d 208, 216 (2d Cir. 1999). The mark (1) is sufficiently distinctive (as we discuss in the text), (2) has been used by Sportsman's for an extended period of time, (3) has had millions of dollars in advertising spent on it, (4) is used nationwide, and (5) is traded in a wide variety of retail channels. See 15 U.S.C. 1125(c)(1)(A)-(E). Moreover, the record does not indicate that anyone else besides Sportsman's uses sporty's, and the mark is, of course, registered with federal authorities. See id. at 1125(c)(1)(G)-(H).
 More vexing is the question posed by the criterion that focuses on "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought." Id. at 1125(c)(1)(F). Sporty's Farm contends that, although sporty's is a very well-known mark in the pilot and aviation niche market, Sportsman's did not (and could not) prove that the mark was well-known to Sporty's Farm's customers. We need not reach this question, as we would have had to do under the FTDA, since the ACPA provides protection not only to famous marks but also to distinctive marks regardless of fame.
 
 
 [11]
 We note that "confusingly similar" is a different standard from the "likelihood of confusion" standard for trademark infringement adopted by this court in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961). See Wella Corp. v. Wella Graphics, Inc., 37 F.3d 46, 48 (2d Cir. 1994).
 
 
 [12]
 These factors are:
 (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
 (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
 (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
 (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
 (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
 (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
 (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
 (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
 (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43. 15 U.S.C. 1125(d)(1)(B)(i).
 
 
 [13]
 We expressly note that "bad faith intent to profit" are terms of art in the ACPA and hence should not necessarily be equated with "bad faith" in other contexts.
 
 
 [14]
 The statute provides that a party "shall be liable in a civil action by the owner of a mark" if it meets the statutory requirements. 15 U.S.C. 1125(d)(1)(A) (emphasis added). Although the statute uses the term "liable," it does not follow that damages will be assessed. As we discuss below, damages can be awarded for violations of the Act but they are not "available with respect to the registration, trafficking, or use of a domain name that occurs [,as in this case,] before the date of the enactment of this Act." Pub. L. No. 106-113, 3010.
 
 
 [15]
 The "cigarette rule" was originally adopted by the Federal Trade Commission in 1964. See Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (1964), see also FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5 (1972). This rule was later adopted by the Connecticut Supreme Court in Conaway v. Prestia, 191 Conn. 484, 464 A.2d 847 (1983), after the Connecticut legislature directed the Connecticut courts to "be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act," when determining what constituted an unfair trade practice. Conn. Gen. Stat. Ann. 42110b(b) (West Supp. 1999); see McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185, 1191 (1984).
 
 
 [16]
 The district court rejected the retroactivity argument on the ground that Sporty's Farm did not begin using sportys.com until after the FTDA came into effect. Since Sporty's Farm's retroactivity claim fails even if we analyze the issue as of the time when it initially contracted to acquire the domain name, we express no view on whether the district court's reference point was, in fact, the correct one.
 
 
 [17]
 For the first time on appeal, Sporty's Farm argues that the district court's application of the FTDA constituted an unconstitutional taking of its property in sportys.com. We deem this argument waived. In the alternative, Sporty's Farm contends that the district court's injunction was inequitable because it deprived Sporty's Farm of its lawfully acquired interest in sportys.com and hence was issued in violation of 15 U.S.C. 1125(c)(1), which provides that injunctions are "subject to the principles of equity and upon such terms as the court deems reasonable." The argument is meritless. The same facts that led us to find that Sporty's Farm is liable under the ACPA preclude, in the circumstances before us, any inequity in depriving Sporty's Farm of the domain name in issue.