*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0310P (6th Cir.)
File Name: 03a0310p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

FORD MOTOR COMPANY,
  *Plaintiff-Appellee,*

  *v.*

PETER CATALANOTTE,
  *Defendant-Appellant.*

No. 02-1237

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-75260—Robert H. Cleland, District Judge.

Argued: June 18, 2003

Decided and Filed: August 28, 2003

Before: BOGGS and GILMAN, Circuit Judges;
MARBLEY, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Anthony J. DeGidio, Toledo, Ohio, for Appellant. Scott R. Ryther, HOWARD, PHILLIPS &

———————————

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

ANDERSON, Salt Lake City, Utah, for Appellee. **ON BRIEF:** Anthony J. DeGidio, Toledo, Ohio, for Appellant. Scott R. Ryther, Gregory D. Phillips, HOWARD, PHILLIPS & ANDERSON, Salt Lake City, Utah, for Appellee.

———————————

**OPINION**

———————————

ALGENON L. MARBLEY, District Judge. Defendant-Appellant, Peter Catalanotte ("Catalanotte"), appeals the district court's decision awarding Plaintiff-Appellee, Ford Motor Company ("Ford"), $5,000 in statutory damages pursuant to the Anticybersquatting Consumer Protection Act. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 15 U.S.C. § 1121(a). For the following reasons, we **AFFIRM** the district court's award of statutory damages.

## I. BACKGROUND

### A. Factual Background

Peter J. Catalanotte registered the Internet domain name FORDWORLD.COM on January 21, 1997. Catalanotte, an employee of Ford since 1978, knew that Ford publishes a newspaper for its employees called *Ford World*. Catalanotte never operated an Internet website using the domain name FORDWORLD.COM.

Ford was unaware that Catalanotte had registered the domain name FORDWORLD.COM until October 27, 2000, when Catalanotte sent an e-mail message to Mr. Jacques Nasser and Mr. William Clay Ford, officers of Ford. Catalanotte's e-mail message stated:

> The domain name fordworld.com will be available for a short period of time. . . . I have been receiving offers

from various sources including the competition. I've indicated to the other interested parties that I'm extending this opportunity to you first before any decisions are to be made.

In fact, Catalanotte had not received any offers for the domain name FORDWORLD.COM.

In addition to registering the domain name FORDWORLD.COM, Catalanotte also registered and sold the domain names AANDE.COM and MRSPAULS.COM. Catalanotte never operated a website using either of these domain names. Catalanotte sold the domain name AANDE.COM to the Arts & Entertainment Network, which owns the trademark A&E, and he sold the domain name MRSPAULS.COM to Mrs. Paul's Kitchens, Inc., which owns the trademark MRS. PAUL'S.

### B. Procedural History

Ford filed its Complaint in this case on November 30, 2000, in the United States District Court for the Eastern District of Michigan. Ford's Complaint alleges cyberpiracy, trademark dilution, trademark infringement, and false designation of origin. Ultimately, the district court issued its Findings of Fact and Conclusions of Law on January 10, 2002, finding Catalanotte liable under the Anticybersquatting Consumer Protection Act of 1999. The district court granted Ford injunctive relief and $5,000 in statutory damages.

### II. STANDARD OF REVIEW

In reviewing the district court's award of statutory damages, we will not disturb the district court's findings of fact unless they are clearly erroneous, but we review any issues of law *de novo*. *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 355 (6th Cir. 1998); *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1116 (6th Cir. 1996).

### III. DISCUSSION

In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA" or the "Act"), Pub. L. No. 106-113, app. I, §§ 3001–3010, 113 Stat. 1501, 1501A-545–52 (Nov. 29, 1999), as an amendment to the Trademark Act of 1946 (the "Lanham Act"). The ACPA applies to a person who "registers, traffics in, or uses a domain name" that is "identical or confusingly similar to" a "distinctive" mark or that is "identical or confusingly similar to or dilutive of" a "famous" mark. ACPA § 3002 (codified at 15 U.S.C. § 1125(d)(1)(A) (2000)). Liability under the ACPA requires a "bad faith intent to profit," and the ACPA provides a list of factors that courts may consider in determining whether a person acts in bad faith. ACPA § 3002 (codified at 15 U.S.C. § 1125(d)(1)(A)–(B)).

The ACPA provides for injunctive relief, ACPA § 3003(a)(1) (codified at 15 U.S.C. § 1116(a)), and recovery of actual damages, ACPA § 3003(a)(2) (codified at 15 U.S.C. § 1117(a)). Furthermore, the ACPA permits a plaintiff to seek, subject to court approval, between $1,000 and $100,000 in statutory damages per domain name in lieu of actual damages. ACPA § 3003(b) (codified at 15 U.S.C. § 1117(d)). The ACPA applies to "all domain names registered before, on, or after the date of the enactment" of the ACPA, but actual and statutory damages are not "available with respect to the registration, trafficking, or use of a domain name that [occurred] before the date of the enactment." ACPA § 3010 (codified at 15 U.S.C. § 1117 note).

In this case, the district court granted Ford injunctive relief and $5,000 in statutory damages because Catalanotte "'used' and 'trafficked in' the domain name FORDWORLD.COM within the meaning of 15 U.S.C. § 1125(d) by offering to sell the domain name to Ford Motor Company."

## A. Pre-Enactment Registration

Catalanotte first argues that he cannot be required to pay statutory damages for the registration, trafficking in, or use of the domain name FORDWORLD.COM because he registered the domain name before enactment of the ACPA. Ford contends that although Catalanotte is not liable for damages for the registration of the domain name, he can be held accountable in damages for trafficking in the domain name because he offered to sell the domain name on October 27, 2000, after enactment of the ACPA.

The ACPA contains the following "Effective Date" provision:

> Sections 3002(a), 3003, 3004, 3005, and 3008 of this title shall apply to all domain names registered before, on, or after the date of the enactment of this Act, except that damages under subsection (a) or (d) of section 35 of the Trademark Act of 1946 (15 U.S.C. 1117) [actual and statutory damages], as amended by section 3003 of this title, shall not be available with respect to the registration, trafficking, or use of a domain name that occurs before the date of the enactment of this Act.

ACPA § 3010 (codified at 15 U.S.C. § 1117 note). Catalanotte argues that section 3010 precludes statutory damages where registration, trafficking, or use of a domain name has occurred before enactment of the ACPA. Thus, he claims that statutory damages cannot be awarded against him because he registered the domain name FORDWORLD.COM before enactment of the ACPA, even though the district court found that he trafficked in the domain name after enactment of the ACPA.

Catalanotte's construction of the Effective Date provision of the ACPA is contrary to the plain language of the provision. In fact, the first portion of the Effective Date provision makes clear that the ACPA "shall apply to all

domain names registered before, on, or after the date of the enactment" of the ACPA. *Id*. Registration, trafficking, and use of a domain name are separate acts upon which liability may be based. Although damages may not be awarded for pre-enactment registration, trafficking, or use, the fact that a domain name was registered before the Act's passage does not absolve the registrant from liability for post-enactment trafficking or use. In this case, the district court did not award Ford any damages for Catalanotte's registration of the domain name FORDWORLD.COM. Instead, the district court awarded damages only for Catalanotte's trafficking in and use of the domain name *after* passage of the Act, when Catalanotte offered to sell the domain name to Ford.

Catalanotte cites several cases addressing the ACPA, but they fail to support his position that the ACPA precludes liability based on domain names that were registered prior to enactment of the ACPA. In *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 362 (4th Cir. 2001), the defendant registered the domain name PETA.ORG in 1995 to host a website for "People Eating Tasty Animals," a parody of the plaintiff's organization. The defendant used the domain name for six months in 1995 and 1996 before moving the website to a different domain name. *Id.* at 363. The plaintiff in *Doughney* sued seeking only injunctive relief. *Id.* Therefore, the court did not have an opportunity to consider whether an award of damages was appropriate, although the court found that the ACPA applies retroactively to all domain names registered before enactment of the ACPA. *Id.* at 368. The court quoted the ACPA's prohibition against damages for conduct before the Act's enactment and noted that damages could not be awarded because the defendant's registration and use of PETA.ORG all occurred before enactment of the ACPA. *Id.*

Catalanotte also relies on *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 500 (2d Cir. 2000), where the court found that damages under the ACPA were unavailable because the domain name at issue "was registered

and used . . . prior to the passage of the new law." What Catalanotte fails to note, however, is that the infringing party in *Sporty's* did not use the domain name after enactment of the ACPA; therefore, the court had no reason to consider whether the infringer could be liable for damages for conduct after the ACPA's enactment. In *Sporty's*, a competitor of Sportsman's Market, Inc. registered the domain name SPORTYS.COM in 1995. *Id.* at 494. In 1996, the competitor sold the domain name to a newly formed subsidiary, Sporty's Farm, which grows and sells Christmas trees. *Id.* Sporty's Farm soon began using the domain name for a website advertising its Christmas trees. *Id.* Although the ACPA was not enacted until the *Sporty's* case was on appeal, the district court had issued an injunction pursuant to the Federal Trademark Dilution Act, prohibiting Sporty's Farm from using the domain name SPORTYS.COM. *Id.* Thus, Sporty's Farm never used or trafficked in the domain name after enactment of the ACPA. Unlike in *Doughney* and *Sporty's*, the district court in this case found that Catalanotte used and trafficked in the domain name FORDWORLD.COM after enactment of the ACPA when he offered to sell the domain name to Ford in October 2000.

In several other cases, courts have found that damages are available pursuant to the ACPA for post-enactment use or trafficking, although the domain name at issue was registered before the ACPA's enactment. *See E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 277 (5th Cir. 2002) ("[A]lthough [the defendants] registered the domain name before the effective date of the ACPA, because they *used* the domain name after this date, they can be held liable for statutory damages for this use."); *Shields v. Zuccarini*, 254 F.3d 476, 486–87 (3d Cir. 2001) (deciding that although the defendant had registered the domain names at issue before enactment of the ACPA, his "continued use of the domain names after November 29, 1999 subjects him to the statute's proscriptions and remedies"); *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 268 (4th Cir. 2001) ("A person who unlawfully registers, traffics in, or uses a

domain name after the ACPA's date of enactment, November 29, 1999, can be liable for monetary damages . . . .").

We reject, therefore, Catalanotte's argument that the ACPA precludes an award of damages based on trafficking in a domain name that was registered before enactment of the ACPA, but that was trafficked in after the Act's enactment. According to the plain language of the Act, liability may be based on trafficking that occurred after the Act's enactment, regardless of when the domain name was registered.

## B. Catalanotte's Use or Trafficking in Domain Name After November 29, 1999

Catalanotte argues that he did not register, traffic in, or use the domain name FORDWORLD.COM after November 29, 1999, the date of the ACPA's enactment. First, Catalanotte registered the domain name on January 21, 1997, before the Act's enactment. Therefore, the district court did not base its award of damages on Catalanotte's registration of the domain name.

Second, Catalanotte argues that he did not traffic in the domain name FORDWORLD.COM because he intended to give the domain name to Ford as a gift. Catalanotte argues that a transfer must be "for consideration" for it to be actionable as "trafficking" under the ACPA. 15 U.S.C. § 1125(d)(1)(E). But Catalanotte's contention that he intended to give Ford the domain name as a gift is contradictory to the district court's finding of fact that Catalanotte offered the domain name to Ford for sale. The district court found as follows:

The substance of the email sent by [Catalanotte] to the executives of Ford clearly indicated, without attaching a price tag, that the domain name was for sale, as it juxtaposed the assertion that the domain name would be "available for a limited time," with the assertion that

[Catalanotte] had already received "offers" from "various sources including the competition."

This finding was not clearly erroneous. Furthermore, Catalanotte states that he does not contest the district court's findings of fact. Therefore, we reject Catalanotte's argument that his offer to Ford was an offer to give Ford the domain name FORDWORLD.COM as a gift.

At oral argument, counsel for Catalanotte argued that Catalanotte did not traffic in the domain name FORDWORLD.COM when he offered it for sale to Ford. The ACPA defines the term "traffics in" as referring to "transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." § 1125(d)(1)(E). Catalanotte argues that although the definition of "traffics in" is broad, the definition requires a "transaction" such as a sale or purchase, not a mere offer for sale or purchase. He contends that such an offer is not a "transaction."

We conclude that, when Catalanotte registered the domain name FORDWORLD.COM and later offered it for sale to Ford, he trafficked in the domain name for the purposes of the ACPA. Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA. In fact, the ACPA includes offers for sale as an example of the kind of conduct that courts may consider in determining whether a domain name registrant acts in bad faith. § 1125(d)(1)(B)(i)(VI) ("In determining whether a person has a bad faith intent . . . , a court may consider . . . the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner . . . ."); *see also Virtual Works*, 238 F.3d at 270 (finding that an offer to sell the domain name VW.NET to Volkswagen for a profit evidenced bad faith). Accordingly, we conclude that Catalanotte trafficked in the

domain name FORDWORLD.COM for purposes of the ACPA when he offered to sell the domain name to Ford.

Finally, Catalanotte contends that he did not *use* the domain name FORDWORLD.COM after November 29, 1999, as the district court found that he never operated a website with the domain name. The district court, however, determined that Catalanotte both used and trafficked in the domain name FORDWORLD.COM when he offered to sell the name to Ford on October 27, 2001. Catalanotte argues that Congress must have meant something different by the terms "traffics in" and "uses" in the ACPA, 15 U.S.C. § 1125(d)(1)(A)(ii), because had Congress meant the term "uses" to include "traffics in," it would not have included both terms in the statute. Ford responds that Catalanotte's warehousing of the domain name and subsequent offer to sell the name constitutes use under the Act. We need not decide on this appeal whether "uses" includes "traffics in" under the ACPA because the district court based its award of statutory damages solely on Catalanotte's offer to sell the domain name FORDWORLD.COM to Ford. Whether that offer is characterized merely as trafficking in the domain name or both "trafficking in" and "using" the domain name is of no consequence to the district court's award of statutory damages. Because we conclude that Catalanotte trafficked in the domain name FORDWORLD.COM when he offered to sell it to Ford, we need not consider the meaning of the term "uses" in 15 U.S.C. § 1125(d)(1)(A)(ii) on this appeal.

### C. Statute of Limitations

Catalanotte argues that the district court should have dismissed Ford's entire ACPA claim because it was barred by the statute of limitations. He claims that although the Lanham Act lacks an express statute of limitations, courts generally apply an analogous state statute of limitations to federal actions. In that vein, Catalanotte urges that a three-year statute of limitations applies for Lanham Act claims brought in Michigan. Ford responds that the equitable

doctrine of laches governs Lanham Act claims, not the Michigan statute of limitations, and therefore, because Ford filed suit just over a month after learning of Catalanotte's registration of FORDWORLD.COM, laches does not bar its ACPA action.

Catalanotte registered the domain name FORDWORLD.COM on January 21, 1997 and offered it for sale to Ford on October 27, 2000. Ford filed its Complaint in this case on November 30, 2000. Catalanotte argues that the statute of limitations bars Ford's ACPA claim because Ford filed suit more than three years after Catalanotte registered the domain name FORDWORLD.COM.

Catalanotte's argument is an attempt to apply a statute of limitations that is inapplicable to Lanham Act claims. Although the Supreme Court has adopted analogous state statutes of limitations in the context of certain federal actions, *see, e.g.*, *Reed v. United Transp. Union*, 488 U.S. 319, 334 (1989) (noting the "well established rule that statutes of limitations for federal causes of action not supplied with their own limitations period will be borrowed from state law" and applying that rule to claim brought pursuant to the Labor-Management Reporting and Disclosure Act of 1959); *Wilson v. Garcia*, 471 U.S. 261, 266–67, 280 (1985) (applying analogous state statute of limitations to 42 U.S.C. § 1983 claim), courts have not treated Lanham Act cases in the same manner. Instead, the "Lanham Act does not contain a statute of limitations. In determining when a plaintiff's suit should be barred under the Act, courts have consistently used principles of laches as developed by courts of equity." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985). Unlike statutes of limitations, "laches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). Laches, rather than a state statute of limitations, governs claims brought to enforce an "equitable right created by Congress." *Id.* at 395.

Catalanotte notes that there is a "presumption of laches" that holds that "an action is barred if not brought within the period of the [analogous state] statute of limitations and is alive if brought within the period." *Tandy Corp.*, 769 F.2d at 365. The analogous state statute of limitations in this case is three years. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 321 (6th Cir. 2001). But Catalanotte otherwise fails to address the elements of laches, which are of crucial importance in this case. To invoke the equitable doctrine of laches, a party must show: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* at 320.

With respect to the first requirement, a party's notice or lack of notice that its rights are being infringed is particularly relevant to determining whether that party lacked diligence in protecting its rights. *See id.* at 321. In this case, Ford first learned of Catalanotte's registration of FORDWORLD.COM on October 27, 2000, when Catalanotte offered to sell the domain name to Ford. Therefore, Ford did not lack diligence in asserting its rights because it filed a lawsuit against Catalanotte on November 30, 2000. Furthermore, with respect to the second element of laches, the district court found that Catalanotte "did not reasonably rely to his detriment upon any knowing inaction on the part of [Ford] in registering, using, or trafficking in the domain name FORDWORLD.COM." For this reason, Catalanotte cannot show that he was prejudiced by Ford's failure to assert its rights before November 30, 2000.

Accordingly, we conclude that Ford's ACPA claim is not barred by the equitable doctrine of laches because Ford did not lack diligence in asserting its rights and because Catalanotte was not prejudiced by the timing of Ford's lawsuit.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's award of $5,000 in statutory damages to Ford.