NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0475n.06

No. 09-2192

**FILED**
**Aug 05, 2010**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

RENEE FINNERTY,

     Plaintiff - Appellant

v.

RADIOSHACK CORP., KIOSK OPERATIONS,
INC., AND SC KIOSKS, INC.,

     Defendant - Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

_____/

Before:  MARTIN, CLAY, and KETHLEDGE, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge.  Renee Finnerty appeals an order entered on March 30, 2009 by the United States District Court for the Eastern District of Michigan, granting summary judgment in favor of defendants RadioShack Corporation, Kiosk Operations, Inc., and SC Kiosks, Inc. (collectively referred to as "RadioShack") on Finnerty's claims of discrimination, in violation of the Family Medical Leave Act, 29 U.S.C. § 2611, *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2102, *et seq.*  The district court, in granting defendants' motion for summary judgment, concluded that:  (1) Finnerty's supplemental pleading as it related to RadioShack was barred by the statute of limitation; (2) successor liability should not be imposed on RadioShack; and (3) Finnerty's claims against RadioShack were barred by the equitable doctrine of laches.  As Finnerty's claims were barred by laches, we **AFFIRM** the district court's judgment.

**I.**

Wireless Retail, Inc. was a privately held national retail chain specializing in the sale of cellular phones and services. Wireless Retail was headquartered in Scottsdale, Arizona and operated over 675 stores, primarily kiosks that operated inside shopping malls and retailers such as Sam's Club, Wal-Mart, K-Mart, Best Buy, Home Base, and Sears.

Finnerty began her employment with Wireless Retail in October 2000. She was hired as a sales representative and earned $6.50 per hour plus commission. In her role as a sales representative, Finnerty sold cellular phones and other wireless devices in kiosks located in various stores, including Sam's Clubs. Finnerty resigned after working for Wireless Retail for about two months in order to concentrate on her college studies. By April 2001, Finnerty was once again employed by Wireless Retail and became a store supervisor and, later, a field manager.

Each time she was hired, Finnerty signed a "Co-Employee Notice and Agreement," stating that she was jointly employed by Wireless Retail and CNA Unisource Inc. ("CNA"), a professional employer organization.[1] The Co-Employee Notice and Agreement provided that CNA would pay Finnerty the applicable minimum wage in the event that Wireless Retail failed to pay CNA for the services Finnerty performed. The agreement directed Finnerty to contact CNA's human resources department regarding discrimination claims arising during the course of her employment.

In March 2002, Finnerty learned that she was pregnant and, according to her deposition, she was required to work longer hours than prior to becoming pregnant. Finnerty testified that the

---

[1] A professional employer organization typically provides personnel and human resources management services to its clients. *See Ball v. Transcon Employment Co.*, No. 1:04 CV 00578, 2006 WL 462435, at *1 (S.D. Ohio Feb. 24, 2006).

intensity of her workload led her to request a demotion from field manager to store supervisor, which she received on July 22, 2002. Finnerty also testified that, even after her demotion, she was still required to work an intense schedule and received no relief despite her requests.

On September 12, 2002, Finnerty contacted Wireless Retail's human resources department to inquire about the company's maternity leave policy and was informed that, although Wireless Retail did not have a maternity leave policy, Finnerty would be eligible for leave under the Family Medical Leave Act. Wireless Retail subsequently sent Finnerty information explaining the company's Family Medical Leave Act leave policy, which required Finnerty to furnish medical certification of a serious health condition. Finnerty's Family Medical Leave Act leave was to commence on November 1, 2002, but as she did not feel well because of her pregnancy, Finnerty called her field manager and requested that her leave begin on October 26, 2002. Finnerty's field manager approved her request. Nonetheless, after Finnerty submitted her medical certification on November 4, 2002, Finnerty's field manager contacted her, informing Finnerty that Finnerty's employment had been terminated because of three "no-call no shows."

On July 21, 2004, Finnerty filed suit against Wireless Retail, alleging violation of the Family Medical Leave Act as well as pregnancy discrimination in violation of the Elliott-Larsen Civil Rights Act. On August 26, 2004, Wireless Retail removed the action to federal court.

On October 1, 2004, Wireless Retail entered into an Asset Purchase Agreement with defendant SC Kiosks, Inc., a wholly-owned subsidiary of RadioShack. Pursuant to the Asset Purchase Agreement, Wireless Retail sold certain specified "Purchased Assets" to RadioShack, including fixtures, information systems, training and distribution assets, and inventory "used for the

operation of retail kiosks that sell and activate phones pursuant to the Communication Center Kiosk License Agreement, by and between [Wireless Retail] and Sam's West, Inc." RadioShack also acquired the lease interest in Wireless Retail's Arizona headquarters, but sub-leased part of the space back to Wireless Retail, which continued to operate its non-Sam's Club kiosks independently. Wireless Retail also agreed to terminate its agreement, and RadioShack negotiated its own licensing agreement, with Sam's Club. Under Section 6.4 of the Asset Purchase Agreement, Wireless Retail agreed to terminate its employees identified in Schedule 3.7, effective September 30, 2004, and RadioShack agreed to offer those employees employment the following day.

Specifically excluded from the liabilities RadioShack assumed were, *inter alia*, "any liabilities, claims or obligations relating to any employee of [Wireless Retail] and not expressly assumed by [RadioShack] in Section 1.2(a) of the agreement.[2] Other excluded liabilities included "any [l]iability arising out of any [p]roceeding pending" as of the date of the Asset Purchase Agreement and "any [l]iability arising out of or resulting from [Wireless Retail's] compliance or noncompliance with any [l]egal [r]equirement or [o]rder of any [g]overnmental [a]uthority." Schedule 3.4 sets forth the pending lawsuits against Wireless Retail, including Finnerty's lawsuit, which are among the excluded liabilities.

On March 4, 2005, Wireless Retail answered Finnerty's interrogatories and indicated that an insurance policy existed at the time of the alleged discrimination and that pursuant to the terms of the policy, the insurer would be liable for the payment of any damages awarded in this case. On July

---

[2] In Section 1.2(a), RadioShack assumes Wireless Retail's liabilities and obligations under the Seller Contracts, a term defined by reference to other contractual provisions that do not implicate the instant action.

28, Wireless Retail filed a motion for summary judgment, which was denied on January 30, 2006 following a hearing on the motion. After the January 30th hearing, Wireless Retail's counsel informed Finnerty that Wireless Retail was out of business and that he intended to file a motion to withdraw as counsel, indicating that the company had ceased as an ongoing entity.

On February 10, 2006, Wireless Retail's counsel moved to withdraw as counsel and Finnerty moved for leave to amend her complaint in order to add RadioShack as a successor corporation. In her motion, Finnerty argued that she was first informed on January 30th that Wireless Retail was uninsured with respect to Finnerty's claim and that Wireless Retail had dissolved. Finnerty requested the amendment because Wireless Retail had sold a portion of its business to RadioShack and successor liability was permitted under the Family Medical Leave Act. Finnerty's motion was granted on March 24, 2006, and she filed her amended complaint on April 11, 2006.

RadioShack moved for summary judgment on September 14, 2006, arguing that it was not a successor in interest to Wireless Retail for purposes of Finnerty's discrimination claim, that Finnerty had failed to plead and could not prove a basis for imposing successor liability, and that both of Finnerty's claims against RadioShack were time-barred. RadioShack's motion for summary judgment was denied on March 30, 2007. On November 2, 2007, Finnerty moved for partial summary judgment against RadioShack on the issue of successor liability, and RadioShack renewed its motion for summary judgment on January 18, 2008. The magistrate judge issued a Report and Recommendation on August 26, 2008 recommending that Finnerty's motion for partial summary judgment be granted and RadioShack's renewed motion for summary judgment denied. RadioShack filed objections to the magistrate judge's recommendation. On March 30, 2009, the district court

rejected the magistrate judge's recommendation and granted RadioShack's renewed motion for summary judgment. *Finnerty v. Wireless Retail, Inc.*, 624 F. Supp. 2d 642 (E.D. Mich. 2009). The district court found, in the alternative, that Finnerty's claims are time-barred by the applicable statute of limitations, that RadioShack did not constitute a successor in interest to Wireless Retail for the purposes of this litigation, and that Finnerty's claims are barred by the doctrine of laches. *Id.* Finnerty timely appealed.

## II.

Finnerty claims that her claims are not time-barred because her claim against RadioShack relates back to her claim against Wireless Retail, the RadioShack is a valid successor in interest of Wireless Retail, and that her claims are not barred by laches because she diligently pursued her claim. We will address laches first.

We review "a district court's resolution of a laches question for an abuse of discretion." *Chirco v. Crosswinds Cmties, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (citing *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001)). "To invoke the equitable doctrine of laches, a party must show: '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.'" *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003) (quoting *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)); *see also Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 533 (1956). The party asserting the laches defense may be prejudiced "because it would be inequitable, in light of a change in defendant's position, to allow plaintiff's claim to proceed or because the delay makes it difficult to garner evidence to vindicate his or her rights." *Robins Island Pres. Fund, Inc. v. Southold Dev.*

*Corp.*, 959 F.2d 409, 424 (2d Cir. 1992). Determinations regarding the applicability of a laches

defense must be made in light of all the existing circumstances. *Czaplicki*, 351 U.S. at 533. "[A]ny

delay attributable to [a] plaintiff must be measured from a time at which the plaintiff knew or should

have known that [the] infringement [of his or her rights] ripened into a provable claim." *Kellogg*

*Co. v. Exxon Corp.*, 209 F.3d 562, 569-70 (6th Cir. 2000).

A brief review of the relevant dates is helpful. Finnerty filed suit against Wireless Retail on

July 21, 2004. On October 1, 2004, RadioShack purchased certain assets of Wireless Retail,

including its Sam's Club kiosks, at which Finnerty was working before her termination by Wireless

Retail. On March 31, 2005, Finnerty's counsel deposed Deena Marano, Wireless Retail's human

resources manager. The relevant colloquy is as follows:

> Q: Okay. Have you had any changes *since the sale of Wireless Retail to Radio Shack?*
> A: In what respect?
> Q: Any changes in your responsibilities or the systems or anything like that?
> A: My responsibilities are a little bit changed because *once the sale occurred* then, of course, Tammy Lee is no longer with the company, *she went with that sale,* so Employee Relations now rolls up under myself.
> Q: Okay. But that has only been recently?
> A: Yes, *since the sale of the company.*

*Finnerty*, 624 F. Supp. 2d at 665-66 (emphasis in original). On January 30, 2006, Wireless Retail's

counsel informed Finnerty and the court that Wireless Retail was out of business, the relevant

insurance policy had lapsed and could not cover the potential liability from the Finnerty case, and

it no longer intended to defend the case. On February 10, 2006, less than two weeks later, Finnerty

filed a motion for leave to amend her complaint and to add RadioShack as a defendant. After the

court granted the motion on March 24, 2006, Finnerty filed the amended complaint on April 11, 2006. RadioShack received service on April 25, 2006.

Finnerty argues that it was not until January 30, 2006, when Wireless Retail's counsel informed her that Wireless Retail was out of business and that the company had ceased as an ongoing entity, that she had notice of a possible claim against RadioShack. And, were this the entire story, she would be correct that laches should not apply to bar her claim, as she filed her motion to amend the complaint immediately thereafter.

However, it is clear from the record that Finnerty and her counsel were aware of the sale substantially prior to January 30th. Additionally, at the Marano deposition on March 31, 2005, Finnerty's counsel initiated a discussion of the sale; so the sale was not new information received from Marano or any other Wireless Retail representative that day. The fact that Finnery's counsel knew to ask this question at the deposition implies that, not only was she aware of the sale on March 31, 2005, nine months before she claims to have been aware, she must have had some knowledge of the sale before that date in order to formulate the question. Moreover, in the Marano deposition, Finnerty received confirmation that the sale had gone through, should she have been in doubt, and learned that there had been staffing changes such that some former staff members went to RadioShack as part of the sale. This should have put Finnerty and her counsel on notice to investigate whether Finnerty would have been among the Wireless Retail employees now employed by RadioShack had she not been fired.

Thus, by March 31, 2004, Finnerty and her attorney knew or should have known that Finnerty had a potential claim against RadioShack and that she had a duty to investigate, regardless of the

assurances of Wireless Retail that Finnerty's claim would be covered by the terms of Wireless Retail's insurance policy, now lapsed, and the fact that Wireless Retail continued to defend against the suit until the dissolution of the company. Her subsequent delay in amending her complaint after learning about the sale was unreasonable.

Moreover, this delay prejudiced RadioShack. As the district court noted, Finnerty's own arguments about the difficulties involved in finding Wireless Retail's former employees and the present inability of Wireless Retail to indemnify RadioShack as to this claim that they make in their arguments for successor liability demonstrate a finding of prejudice to RadioShack. It would be at least as difficult for RadioShack to find these documents and witnesses this late in the case as it was for Finnerty, during the appropriate, within-the-statute-of-limitations, discovery period. Thus, Finnerty's delay has prejudiced RadioShack's ability to defend the case on the merits or to seek indemnity from Wireless Retail.

Therefore, Finnerty unreasonably delayed in bringing her claim against RadioShack and was not diligent in pursuing her claims. This delay prejudiced RadioShack's ability to defend against her claims, originally brought against Wireless Retail. Accordingly, based on the record before us, we cannot find that the district court abused its discretion in determining that Finnerty's claim is barred by the doctrine of laches.[3]

---

[3] Because we find that the district court did not abuse its discretion in finding Finnerty's claim barred by the doctrine of laches, we need not examine whether the district court erred in its alternative findings that Finnerty's claim failed based on the statute of limitations and that RadioShack was not a successor in interest.

## III.

We **AFFIRM** the district court's grant of summary judgment.

**CLAY, Circuit Judge, dissenting.** "[T]he appropriateness of successor liability depends on whether the imposition of such liability would be equitable." *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 553-54 (6th Cir. 2006). The FMLA factors relevant to the successor liability inquiry weigh in Plaintiff's favor and, balancing the equities involved, successor liability should be imposed in this case. Because the pertinent FMLA regulations compel the imposition of successor liability and because I disagree with the majority's conclusion that Plaintiff's claim is barred by laches, I respectfully dissent.

In order to assert her right to FMLA leave, Plaintiff filed suit against Wireless Retail, her employer at the time she was fired. Wireless Retail subsequently sold some of its assets to RadioShack, but continued to defend against Plaintiff's lawsuit and even suggested that Wireless Retail's insurance policy would cover Plaintiff's claims. After stringing Plaintiff along through the litigation process, on January 30, 2006, Wireless Retail's counsel informed Plaintiff—following the denial of Wireless Retail's motion for summary judgment—that Wireless Retail had ceased conducting business as an ongoing entity and would no longer be available as a party defendant. As explained below, the applicable FMLA regulations provide the appropriate vehicle to enable Plaintiff to prevail on the issue of successor liability.

The proper focus of this case has been entirely misplaced by the majority. At the heart of the case lies a potential FMLA violation—yet the majority has inexplicably transformed the case into one about laches while declining to consider the merits of Plaintiff's FMLA claim. Specifically, the majority concludes that the record shows that Plaintiff and her counsel were aware of Wireless

Retail's asset sale prior to January 30, 2006 and therefore argues that the doctrine of laches precludes further consideration of Plaintiff's claim.

As this Court has previously stated, "a party's notice or lack of notice that its rights are being infringed is particularly relevant to determining whether that party lacked diligence in protecting its rights." *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003). "[A]ny delay attributable to [a] plaintiff must be measured from a time at which the plaintiff knew or should have known that [the] infringement [of his or her rights] ripened into a provable claim." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569-70 (6th Cir. 2000).

The majority concludes that some knowledge on the part of Plaintiff regarding the Asset Purchase Agreement and Wireless Retail's sale of assets is enough to impute to Plaintiff knowledge of the successor liability issue. In doing so, however, the majority discounts the fact that Wireless Retail remained at least nominally in business following the transaction with RadioShack and even engaged in the discovery process with Plaintiff. Moreover, in March 2005, Wireless Retail answered interrogatories that indicated Plaintiff's claim would be covered by the terms of Wireless Retail's insurance policy. It was not until January 30, 2006, when Wireless Retail's counsel informed Plaintiff that Wireless Retail had ceased doing business as an ongoing entity, that Plaintiff had notice of a possible claim against RadioShack. On February 10, 2006, less than two weeks later, Plaintiff filed a motion for leave to amend her complaint and add RadioShack as a party defendant.

The majority's injection of the laches defense into the case makes no sense under the factual circumstances apparent here. The majority seeks to impose on Plaintiff a burden to investigate in the absence of any apparent need to do so and despite the fact that Wireless Retail continued to string

Plaintiff along a primrose path, failing to indicate along the way that Plaintiff might no longer have a source of recovery. It is commonly understood that laches is recognized as an extraordinary measure that should only be invoked on rare occasions, *see Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985), and the laches question is "one of fairness in light of all the facts." *Lintz v. Skipski*, 25 F.3d 304, 306 (6th Cir. 1994). While it might have been prudent of Plaintiff's counsel to have investigated earlier, that should not prove fatal to Plaintiff's claim in light of the fact that during most of the pendency of the case, the named defendant did not dispute its potential liability on the basis that Plaintiff had sued the wrong party or that any damage award against the named defendant might be unrecoverable or uncollectible.

Moreover, laches is an equitable defense that can only be raised by a defendant with clean hands. *United States v. Weintraub*, 613 F.2d 612, 619 (6th Cir. 1979). In this case, Wireless Retail continued to defend the lawsuit and even informed Plaintiff that if Plaintiff prevailed her claim would be covered under Wireless Retail's insurance plan. Regardless of whether Wireless Retail had a duty to advise Plaintiff regarding insurance coverage, the fact remains that Wireless Retail provided Plaintiff with this insurance coverage information, yet failed to subsequently inform her that no such coverage existed. Instead, Wireless Retail continued to defend the lawsuit–that is, until defense counsel dropped the bombshell on Plaintiff that Wireless Retail had gone out of business. In view of this sequence of events, Wireless Retail's conduct certainly has the smell of impropriety and gives the appearance of unclean hands on the part of Wireless Retail as well as RadioShack— which will benefit tremendously from any possible chicanery that may have been perpetrated by Wireless Retail. Accordingly, laches should not bar Plaintiff's claim.

Because it concluded that Plaintiff's FMLA claim against RadioShack was barred by laches, the majority declined to discuss the merits of Plaintiff's claim. As a preliminary matter, we should first consider the timeliness of Plaintiff's complaint. RadioShack contends that Plaintiff's claims are barred by the applicable statute of limitations.[1] Specifically, RadioShack argues that Plaintiff's FMLA and ELCRA claims expired on November 4, 2005—three years after Plaintiff's employment was terminated. Since Plaintiff did not file her amended complaint[2] until April 11, 2006, RadioShack asserts that Plaintiff's complaint must "relate back" pursuant to Federal Rule of Civil Procedure 15(c) in order to be considered timely.

Plaintiff's amended complaint, however, should be deemed timely. Plaintiff timely filed her complaint against Wireless Retail on July 21, 2004 based on her November 4, 2002 termination. Wireless Retail and RadioShack entered into the Asset Purchase Agreement on October 1, 2004—after Plaintiff filed her complaint against Wireless Retail. Plaintiff subsequently learned that

---

[1]Pursuant to 29 U.S.C. § 2617(c)(1), an FMLA claim must generally be brought "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." However, in the case of willful violations, "such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought." *Id.* Under ELCRA, an action must be brought within three years of the time of the injury. *Garg v. Macomb County Cmty. Mental Health Servs.*, 696 N.W.2d 646, 657-58 (Mich. 2005).

[2]Both the magistrate judge and the district judge decided that Plaintiff's amended pleading would be more properly treated as a supplemental pleading since a supplemental pleading is one that sets forth "transaction[s], occurrence[s], or event[s] that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Because Plaintiff filed her complaint on July 21, 2004 and because the Asset Purchase Agreement was not entered into until October 1, 2004, Plaintiff's amended complaint should be treated as a supplemental pleading. The distinction between an amended pleading and a supplemental pleading is often disregarded for purposes of relation back under Rule 15(c). *See* 6A Charles Alan Wright, et al., Federal Practice & Procedure § 1508 (2d ed. 1987) (noting that "the policy underlying the statute of limitations is in no way compromised by allowing a supplemental pleading to relate back.").

Wireless Retail sold some of its assets to RadioShack, but Wireless Retail remained in business after the sale, continuing to defend against Plaintiff's lawsuit, and even informed Plaintiff that her claim would be covered by the terms of its insurance policy.

On January 30, 2006, Wireless Retail's counsel informed Plaintiff that Wireless Retail had ceased conducting business as an ongoing entity. It was not until this date, January 30, 2006, that Plaintiff had notice of a possible cause of action against RadioShack. Less than two weeks later, on February 10, 2006, Plaintiff moved to add RadioShack as a party defendant. Because Plaintiff filed her amended complaint against Radioshack within two years after discovering a possible cause of action against RadioShack, her claim against RadioShack does not fall outside the applicable statute of limitations period. Even if, *arguendo*, the statute of limitations can be said to have begun to run on October 1, 2004—at the time Wireless Retail and RadioShack entered into the Asset Purchase Agreement—Plaintiff's complaint is still timely because Plaintiff filed her amended complaint on April 11, 2006, which is well within the baseline two-year statute of limitations period. Accordingly, Plaintiff's claim should be deemed timely.

RadioShack's reliance on Rule 15(c) is misplaced because although Rule 15(c) generally applies in cases where a plaintiff makes a mistake regarding a party's identity, *see Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996), the rule only applies when a plaintiff fails "to identify individual defendants when the plaintiff *knows that such defendants must be named*." *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) (emphasis added); *see id.* ("Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties (under certain circumstances), but the failure to identify individual defendants when the

plaintiff knows that such defendants must be named cannot be characterized as a mistake.")
Wireless Retail had not entered into the agreement with RadioShack at the time Plaintiff filed her complaint and therefore, Plaintiff had no reason to know that RadioShack needed to be named at the time she filed her complaint. It is only reasonable to require Plaintiff to "name those who were known to [her]" or should have been known to her at the time she filed her complaint. *See EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974). Thus, Rule 15(c) would not bar Plaintiff's amended complaint. I now turn to the merits of Plaintiff's claim.

The FMLA was enacted "to balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons" in a manner that "accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(1)-(3). Under the FMLA, "eligible" employees[3] may take up to twelve weeks of unpaid leave from their employer for certain situations such as the birth of a child. *See id.* § 2612(a)(1). An "employer" is "any person engaged in commerce or in any industry or activity affecting commerce who employees 50 or more employees" and includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer" as well as "any successor in interest."[4] *Id.* § 2611(4)(A). Plaintiff's successor liability claim stems from the Asset Purchase Agreement by which RadioShack purchased a substantial portion of Wireless Retail's assets. In order for RadioShack to be considered

---

[3]An "eligible" employee is one who has been employed by his or her employer for at least twelve months and has worked at least 1,250 hours during the previous twelve-month period. 29 U.S.C. § 2611(2)(A).

[4]A "successor in interest" is "[o]ne who follows another in ownership or control of property." Black's Law Dictionary 1446 (7th ed. 1999).

a covered employer under the FMLA, Plaintiff must demonstrate that RadioShack is a successor in interest to Wireless Retail for the purpose of providing Plaintiff with relief pursuant to her FMLA claim.

The regulations implementing the FMLA enumerate several factors to be considered in determining whether an employer is a successor in interest to a previous employer. The factors to be considered include:

(1) Substantial continuity of the same business operations;

(2) Use of the same plant;

(3) Continuity of the work force;

(4) Similarity of jobs and working conditions;

(5) Similarity of supervisory personnel;

(6) Similarity in machinery, equipment, and production methods;

(7) Similarity of products or services; and

(8) The ability of the predecessor to provide relief.

29 C.F.R. § 825.107(a). "The regulations implementing the FMLA instruct courts to consider the factors . . . in determining whether a covered employer is a successor in interest to a previous employer." *Cobb*, 452 F.3d at 551 (citing 29 C.F.R. § 825.107) (internal quotation marks omitted); *see also Grace v. USCAR & Bartech Technical Servs., LLC*, 521 F.3d 655, 671 (6th Cir. 2008) (noting that the FMLA regulations require courts to consider these factors when determining whether an employer constitutes a successor in interest). These factors are not, in themselves, the test for successor liability, but rather are merely factors the Court considers in its balancing of equities.

Although notice of the employee's claim is generally irrelevant to determinations regarding successor liability, notice may be relevant in determining successor liability for the predecessor's violations. 29 C.F.R. § 825.107(a).

Plaintiff claims that the district court erred in analyzing the factors relevant to determining successor liability and misconstrued the relevance of notice in this case. RadioShack counters that its lack of notice is critical to the equitable calculus and that the relevant factors and balance of interests weigh in its favor.

A successor in interest may be held liable for the discriminatory employment practices of the predecessor company. *MacMillan*, 503 F.2d at 1091. The Court will impose successor liability where it would be equitable to do so considering (1) the defendant's interest, (2) the plaintiff's interest, and (3) the federal policy embodied in the relevant statutes. *Cobb*, 452 F.3d at 551-52 (citing *MacMillan*, 503 F.2d at 1089-91). Whether an employer is a successor in interest is not determined by applying a single criterion, but rather by "the entire circumstances . . . viewed in their totality." 29 C.F.R. § 825.107(b). "The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." *Cobb*, 452 F.3d at 554. The relevant factors and the balancing of equities are each addressed in turn below, beginning with RadioShack's notice of Plaintiff's claim.

The parties do not dispute that throughout most of the litigation process, RadioShack had notice of Plaintiff's claim, which was specifically referenced as an excluded liability in the Asset Purchase Agreement. The parties do, however, dispute the effect of RadioShack's notice and its disclaimer of liability.

In its notice analysis, the district court relied upon the liabilities exclusion, but such a provision is not dispositive. Wireless Retail and RadioShack cannot contract away RadioShack's potential FMLA liability to an individual who is not even a party to the contract between them. Indeed, the Supreme Court and this Court have both indicated that a successor can protect itself against potential liability by negotiating the contract price, but there is no authority stating such negotiations eliminate successor liability altogether. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 171-72 n.2 (noting that the successor employer's "potential liability for remedying the unfair labor practices is a matter which can be reflected in the price [the successor employer] pays for the business, or [the successor employer] may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices."); *see also MacMillan*, 503 F.2d at 1090 (quoting *Golden State*, 414 U.S. at 171-72 n.2). Instead, RadioShack could presumably seek indemnity from Wireless Retail if found liable on Plaintiff's discrimination claim. Accordingly, this factor weighs in favor of finding successor liability.

RadioShack also claims that Wireless Retail's ability to provide Plaintiff with relief weighs against a finding of successor liability. Specifically, RadioShack claims that Wireless Retail had the ability to provide relief with respect to Plaintiff's claim after entering into the Asset Purchase Agreement as evidenced by Wireless Retail's receipt of the purchase price and Wireless Retail's voluntary facilitation regarding the potential settlement of Plaintiff's claim. As asserted by Plaintiff, this factor weighs in favor of successor liability because Wireless Retail has no apparent ability to provide relief for Plaintiff's claim and Wireless Retail intentionally muddied the waters regarding

its inability to provide relief by continuing to defend the lawsuit and stating that her claim was covered under Wireless Retail's insurance policy.

RadioShack further argues that this factor weighs against the imposition of successor liability because of the Co-Employee Notice and Agreement that Plaintiff signed. Plaintiff, however, contends that CNA only printed her paychecks for a period of time, which ended sometime between September 2001 and May 2002. Plaintiff also argues that CNA was never involved with Plaintiff's work or with Plaintiff herself. In support of their respective positions, RadioShack submitted a copy of the signed agreement and Plaintiff submitted a declaration. There is no other evidence regarding CNA's alleged relationship with Wireless Retail. It is undisputed, however, that after Wireless Retail's summary judgment motion was denied at the January 30, 2006 hearing, Wireless Retail's counsel informed Plaintiff that Wireless Retail was out of business and that he intended to file a motion to withdraw as counsel, indicating that the company had ceased as an ongoing entity. Because the primary concern behind the imposition of successor liability is "provid[ing] the discriminatee with full relief," *MacMillan*, 503 F.2d at 1092, this factor also weighs in favor of Plaintiff.

Another relevant factor in determining successor liability involves the continuity of business operations. While it is not entirely clear from the record, Wireless Retail's Sam's Club kiosk business seems to have comprised a majority of Wireless Retail's business. At the time of the sale, Wireless Retail employed 3,500 to 4,000 people, 2,400 of whom transferred to RadioShack. RadioShack also purchased all of Wireless Retail's tangible personal property and inventory used to operate the Sam's Club kiosk business, information systems, training systems, and client and

customer lists. In addition, RadioShack purchased Wireless Retail's lease interest in its Scottsdale headquarters. The extent of RadioShack's purchase evidences the fact that subsequent to the purchase, RadioShack substantially continued Wireless Retail's business.

RadioShack counters that there was no substantial continuation of Wireless Retail's business because pursuant to the Asset Purchase Agreement, Wireless Retail terminated its Sam's Club contract and RadioShack negotiated its own contract with Sam's Club. Nonetheless, RadioShack continued to utilize Wireless Retail's retail outlets and other assets, and RadioShack points to no substantial changes in the operation of the Sam's Club kiosks post-purchase. Accordingly, this factor weighs in favor of imposing successor liability.

Another relevant factor is the continuity of the workforce. Pursuant to the Asset Purchase Agreement, RadioShack began employing Wireless Retail employees who worked at the Sam's Club kiosks. This group of employees represented more than half of Wireless Retail's workforce. RadioShack argues that because Plaintiff frequently worked at non-Sam's Club locations throughout her employment with Wireless Retail, it is speculative whether, if Plaintiff was still employed by Wireless Retail, she would have been hired by RadioShack in accordance with the Asset Purchase Agreement. Notwithstanding RadioShack's speculative conjecture, the application of this factor relates to the continuity of the workforce as a whole and, consequently, also supports the imposition of successor liability.

Related to the continuity of the workforce is the similarity of supervisory personnel. Wireless Retail's sales supervisors were employees who transferred as part of the transaction between Wireless Retail and RadioShack. However, as RadioShack notes, none of Wireless Retail's officers

transferred to RadioShack as officers. Among RadioShack's top management team, only Wireless Retail's Chief Operating Officer transferred over to RadioShack and even then, he only worked there briefly and did so in a different position than the one he held at Wireless Retail. Given this evidence, this factor does not seem to weigh in favor of either party with respect to imposing successor liability.

RadioShack purchased Wireless Retail's Sam's Club kiosks, inventory, training systems, and information systems so that it could operate the kiosks. Accordingly, it is reasonable to conclude that Wireless Retail's employees who transferred over to RadioShack performed the same jobs. Moreover, because RadioShack substantially continued Wireless Retail's business, naturally, the products and services remained the same. Thus, these factors also weigh in favor of imposing successor liability. The remaining factors—use of the same plant, and similarity in machinery, equipment, and production methods—are more relevant in a manufacturing setting, and therefore, do not weigh in favor of or against the imposition of successor liability.

As previously mentioned, although relevant to determining whether to impose successor liability, the factors examined above are not the test for successor liability. Instead, we must balance the defendant's interest, the plaintiff's interest, and the federal policy embodied in the relevant statutes, which in this case is the FMLA. *Cobb*, 452 F.3d at 551-52 (citing *MacMillan*, 503 F.2d at 1089-91).

The prong of the equitable analysis concerning Plaintiff's interest clearly weighs in favor of imposing successor liability. Plaintiff certainly has an interest in receiving relief under the applicable statute and several of the factors discussed above weigh in her favor. RadioShack purchased

specified assets from Wireless Retail and excluded certain liabilities from the transaction, thereby attempting to disclaim liability. However, Radioshack's "potential liability for remedying the unfair labor practices [of Wireless Retail] is a matter which can be reflected in the price [RadioShack] pa[id] for the business, or [RadioShack could have] secure[d] an indemnity clause in the sales contract which [would] indemnify [RadioShack] for liability arising from [Wireless Retail's] unfair labor practices." *Golden State*, 414 U.S. 168, 171-72 n.2; *see Brzozowski v. Corr. Physician Servs., Inc.*, 360 F.3d 173, 177 (3d Cir. 2004) (noting that "the avoidance of labor strife, prevention of a deterrent effect on rights granted employees [by statute], and protection for victimized employees are important goals which can be achieved at minimal cost to a successor" because "[t]he expense resulting from successor liability can be considered in setting the price paid for the business, or through the inclusion of an indemnity clause in the purchase agreement." (citing *Golden State*, 414 U.S. at 185)).

We know that RadioShack utilized the latter protective measure in this case. RadioShack could have also sought other assurances and protected itself in other ways. Moreover, although RadioShack claims it is an innocent successor, we must strike a balance between the conflicting interests involved—those of a victimized employee, those of a successor attempting to disclaim liability, and the purposes and public policies underlying the FMLA.

The FMLA was enacted "to balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1)-(2). As this Court stated in *Grace v. USCAR & Bartech Technical Servs., LLC*, the FMLA's "focus on the individual employee . . . warrant[s] emphasis on the first prong of the equity

analysis; conversely, other labor law issues implicating successor liability (*e.g.* collective bargaining obligations) more obviously implicate employees as a collective *vis-à-vis* their employer's interests, and, by extension, the second prong of the analysis." 521 F.3d at 675. In this case, the purposes underlying the FMLA and Plaintiff's interests outweigh RadioShack's interests. Accordingly, successor liability should be imposed in order to vindicate Congress' goals and objectives in implementing the statute.

Again, because a majority of the relevant factors weigh in favor of imposing successor liability and because after balancing the equities involved, Plaintiff's interests and the policies embodied in the FMLA outweigh RadioShack's interests, successor liability should be imposed. Failure to hold RadioShack liable would leave Plaintiff without a remedy. Where, as in this case, "the predecessor company no longer ha[s] any assets, monetary relief would be precluded. Such a result could encourage evasion in the guise of corporate transfers of ownership." *MacMillan*, 503 F.2d at 1091-92. Unfortunately, the majority opinion provides perverse incentives and encouragement for companies to do just what Wireless Retail and RadioShack appear to have done in this case—muddy the waters regarding the identity of the proper defendant and prolong the litigation process as much as possible so that an argument like laches, for example, can be inappropriately used to defeat a meritorious claim.

I therefore respectfully dissent.