NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0281n.06

Nos. 21-1579/2649

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 14, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| A. B. CERNELLE, | ) | |
| Plaintiff-Appellee/Cross-Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| GRAMINEX, L.L.C.; CYNTHIA R. MAY, | ) | |
| Defendant-Appellants/Cross-Appellees. | ) | OPINION |

Before: SILER, GIBBONS, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Graminex, L.L.C. and A. B. Cernelle started as partners in the dietary supplement, or nutraceutical, industry. After severing that partnership, Cernelle sued Graminex in federal court for using and claiming ownership to Cernelle's trademarks. The parties' settlement confirmed Cernelle's ownership and prohibited Graminex's use of the disputed marks. The district court entered a permanent injunction agreed to in the parties' settlement that prohibited Graminex "from pledging or alienating" the marks.

In 2018, Cernelle filed a motion for contempt and specific performance of the Settlement Agreement. After a multi-day hearing, the district court concluded that Graminex had breached the Settlement Agreement, violated the Permanent Injunction, and should disgorge the profits from three-years' worth of foreign sales. The court later granted in part Graminex's motion to reconsider the wording of the amended Permanent Injunction.

Both parties timely appealed those orders. For the reasons explained below, we **AFFIRM**.

## I.  BACKGROUND

Graminex and Cernelle's relationship began amicably as business partners in the nutraceutical industry. Cernelle is a small company based in Sweden with about thirty employees. For decades Cernelle has produced dietary supplements called nutraceutical products in the United States. The main ingredient of these products is flower pollen. Beginning in the late 1990s, Cernelle purchased some of the raw pollen needed for manufacturing from Graminex, a Michigan-based company led by Cynthia May. A 1999 distributor agreement between the two also gave Graminex the exclusive right to promote, distribute, and sell the resulting nutraceutical products in the United States.

Graminex and Cernelle's relationship then soured. In addition to leading Graminex, May served on Cernelle's Board of Directors, during which time Cernelle alleges she clashed with employees and lenders and mismanaged safety at Cernelle's plant. The animosity culminated in litigation in Sweden over ownership of Cernelle and its assets. As the companies' paths seemingly diverged, Graminex stopped paying Cernelle for the nutraceutical products it received. Cernelle announced the termination of the distributor agreement in 2002 and stopped shipping its products to Graminex.

Cernelle nevertheless continued other overseas sales. It secured a Certificate of Marketing Authorization from the Russian Federation that year, which allowed Cernelle to import and market Cernilton. In 2003, Cernelle had approval to sell its products in Europe, and the U.S. Food and Drug Administration had verified that Cernelle's nutraceutical products promoted prostate health.

The bad blood between the former partners did not dissipate. Cernelle sued Graminex in federal court in 2003, alleging that Graminex was misappropriating Cernelle's trademarks, had

registered websites using Cernelle's trade names, and was marketing its own products with Cernelle's trademarks. Cernelle also alleged that May had held herself out as "chairman" of A.B. Cernelle in applications with the U.S. Patent & Trademark Office to assert falsely that Cernelle had assigned Graminex the rights to CERNITIN®, CERNI-QUEEN®, POLLISPORT®, POLLEN STARK®, CERVITAL™, CERNILTON™, and NAPOLEON GOLD™ for ten dollars on June 14, 2002. Cernelle brought claims for, among other state and federal causes of action, trademark infringement and Lanham Act trademark infringement.

Cernelle largely succeeded on its claims. In August 2004, the district court granted an interlocutory preliminary injunction against Graminex's pledging or alienation of the trademarks while Cernelle pursued its claims with the U.S. Patent & Trademark Office. After evidentiary hearings in November 2005, the district court granted Cernelle a preliminary injunction that enjoined Graminex from alienating or pledging rights to the disputed marks. The stated intent of the injunction was "to prevent the negotiation and execution of contracts, agreements . . . and plans that employ or relate in any manner to the registered trademarks or trademark applications." The order also enjoined Graminex from maintaining any website that was misleading about its relationship with Cernelle or mentioned Cernelle's trademarked products in a way suggesting Graminex was involved in producing or owned those products.

Cernelle and Graminex eventually reached a settlement that confirmed Cernelle's ownership and prohibited Graminex's use of the disputed marks. As part of their Settlement Agreement, Cernelle assigned Graminex all "Graminex" trademarks in Sweden, ratified the termination of the distribution agreement with Graminex, and paid $1,600,000 to a holding company to settle a related judgment in Swedish court. Graminex, in turn, agreed to destroy its Cernelle products and relinquish all claims of ownership to the trademarks and domain names at

issue. The parties further agreed to submit a stipulated permanent injunction to the district court

based on the preliminary injunction. In September 2006, the district court entered that Injunction,

which stated:

> [I]t is **ORDERED** that the defendants Graminex, L.L.C. and Cynthia May, and each of them, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from pledging or alienating the trademarks in dispute, including the following registered trademarks and trademark applications: CERNITIN®, No. 2,529,008 (registered January 15, 2002); CERNILTON®, No. 3,038,705 (registered [January] 10, 2006); CERNI-QUEEN®, No. 2,447,819 (registered May 1, 2001); POLLISPORT®, No. 2,519,274 (registered December 18, 2001); POLLEN STARK®, No. 2,519,275 (registered December 18, 2001); POLITABS SPORT®, No. 2,495,583 (registered October 9, 2001); and 75/857,801; and 76/012,676. This injunction is intended to prevent the negotiation and execution of contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, and plans that employ or relate in any manner to the registered trademarks and trademark applications, except as required by the parties' settlement of this litigation.
>
> It is further **ORDERED** that the defendants Graminex, L.L.C. and Cynthia May, and each of them, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from marketing product manufactured by A.B. Cernelle under labeling that suggests it is not manufactured by A.B. Cernelle or represents that Graminex plays any role in producing the product except furnishing raw materials and acting as a distributor.
>
> It is further **ORDERED** that the defendants Graminex, L.L.C. and Cynthia May, and each of them, the defendants, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from maintaining any website that is misleading as to its relationship with the plaintiff or that mentions the products CERNI-QUEEN®, CERNILTON®, POLLISPORT®, POLLEN STARK®, CERVITAL™, NAPOLEN GOLD™, CERNELLE®, and CERNITIN® in any way that suggests that Graminex is involved in the manufacture, development, or ownership of the products; and selling, promoting, or advertising products manufactured by A.B. Cernelle. . . .
>
> It is further **ORDERED** that this Court shall retain jurisdiction to enforce the terms of the injunctions set forth herein.
>
> It is further **ORDERED** that either party may move to reopen these matters for the purpose of enforcing the settlement agreement on or before **March 30, 2007**.

(R. 85, Permanent Injunction, PageID 2036–37).

Graminex continued its operations after the settlement. Under Cynthia May's direction, Graminex began selling its products to foreign distributors in Russia, Australia, and Thailand. By 2011 May had ceded her official responsibilities as CEO to her daughter, Heather May, but she remained intimately involved at the company and the foreign transactions continued. Although selling its own Pollen Aid tablets to these foreign distributors, Graminex also included CERNILTON® and CERNITIN® on some of the purchase orders, shipping labels, and invoices at the distributors' request.

Some evidence of these transactions and trademark use reached Cernelle as early as 2008. Cernelle's chairman of the board received a trademark watch notice in 2008 indicating that "Graminex Pharma"—the Russian distributor purchasing from Graminex—was using the Cernilton mark in Russia. This alert was likely triggered because Graminex Pharma registered for and held the "cernilton" trademark in the Russian Federation.[1] The predecessor to Graminex Pharma, Euro-Lecon Limited, had previously worked with Cernelle. Cernelle had no market authorization to sell Cernilton or Cernitin in Russia, and Graminex had no ownership of or agency relationship with Graminex Pharma, the Russian distributor. In 2008, the Cernelle Board also discussed the third-party use of its trademarks, but no one at the company identified a clear connection to Graminex. Around the same time Cernelle leadership also became aware that Graminex was posting clinical studies about Cernelle's products on its website.

In 2018, Cernelle filed a motion with the district court, seeking specific performance of the parties' Settlement Agreement and an order finding Graminex in contempt of the court for

---

[1] Trademarks are territorial, which means that a trademark has "a separate existence in each sovereign territory in which is registered or legally recognized as a mark." J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 29.1 (5th ed. 2020); *see also Person's Co. v. Christman*, 900 F.2d 1565, 1568–69 (Fed. Cir. 1990) ("The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme.").

violating the Permanent Injunction. Cernelle alleged that Graminex and May breached the Settlement Agreement and violated the Injunction by: supplying foreign distributors with Graminex pollen products but using CERNILTON®—Cernelle's U.S. trademark—on import forms and paperwork; hosting a foreign business's website advocating for "Cernilton" branded pollen products to support prostate health; and linking to clinical studies about the efficacy of certain Cernelle products on Graminex's own website. Graminex and May vigorously denied those allegations.

After a multi-day evidentiary hearing on the contempt motion, the district court concluded that Graminex and May willfully violated the Settlement Agreement and Permanent Injunction through the sales to foreign customers using paperwork identifying the products as nutraceuticals for which Cernelle held the U.S. trademarks. It also found that the Graminex website's use of clinical studies discussing Cernelle products but featuring Graminex's logo violated the Settlement and Injunction. Although finding the language of the original Permanent Injunction clear, the district court further clarified it through the addition of a specific prohibition on Graminex and May "from selling any product if the sales o[r] shipping paperwork uses any of the marks identified in the permanent injunction" and "from selling product to any customer or distributor that uses any of those marks in marketing or packaging the product." (R. 219, Contempt Order, PageID 9322). The expanded Injunction further required Graminex and May to "remove the studies displaying [Graminex's] beaker logo, which mention the plaintiff's branded products." (*Id.*, PageID 9323) The district court also granted Cernelle's request for disgorgement of Graminex's profits from foreign sales but limited the disgorgement to three years from the date that Cernelle sent its cease-and-desist letter to Graminex. This calculation resulted in a disgorgement of $535,854.

In May 2021, the district court partially granted Graminex and May's motion for reconsideration. The court agreed with Graminex and May that the scope of the Remedial Permanent Injunction swept too broadly. The court found that it lacked the usual authority to alter the Permanent Injunction's reach because that injunction was based on the Settlement Agreement. Substituting the words "should know" with "reason to know," the court concluded, was more in line with the Settlement Agreement and original Permanent Injunction's mandate.

Both parties timely appealed the district court's decisions on Cernelle's contempt motion and Graminex's motion for reconsideration. Graminex raises five issues on appeal: (1) whether the district court erred in finding breach of the Settlement Agreement; (2) whether the district court committed legal error in holding the defendants in contempt for using Cernelle trademarks on shipping labels and invoices for foreign customers; (3) whether the district court erred in disgorging profits from the company's sales to a Russian distributor; (4) whether the district court abused its discretion in deciding that Graminex's hosting of clinical studies on Cernelle products on its website amounted to contempt; and (5) whether the district court erred in rejecting the laches defense. Cernelle raises two unique challenges. First, Cernelle argues that the district court committed legal error in limiting the disgorged profits to only three years of sales. Second, Cernelle asserts that the district court erred in granting Graminex's motion for reconsideration and amending the judgment to narrow the scope of the remedial Injunction.

## II.  ANALYSIS

### A.  Breach of the Settlement Agreement

A district court's decision to enforce a settlement agreement is reviewed for an abuse of discretion. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 419 (6th Cir. 2000). Legal questions, such as the proper interpretation of an agreement, are reviewed de novo. *Solo v. UPS*

*Co.*, 819 F.3d 788, 794 (6th Cir. 2016). A settlement agreement is governed according to state contract law, *id.*, and we therefore apply Michigan law in light of the Settlement Agreement's choice-of-law provision.

Under the Settlement Agreement, Graminex and May pledged to "relinquish all claims of ownership" to Cernelle's trademarks and to refrain from using "Cernelle's trademarks and trade names." (R. 89-2, PageID 2100–01) The district court concluded that Graminex's foreign sales were willful and intentional violations of these portions of the parties' Settlement Agreement. Evidence of the breach was plentiful. The shipping labels prepared for Graminex's products sold to Russian Graminex Pharma between 2006 and 2018 include both "Graminex LLC" as the return address and list contents such as "48 Cernilton – 100 Count" and "12 Cernilton – Forte 50 Count." Export declarations, invoices, insurance documents, and packing slips for sales to Graminex Pharma similarly list the products as Cernilton. At least one invoice for a Graminex shipment to Graminex Thailand after the district court entered the Permanent Injunction includes a product listed as "Cernilton." Similarly, numerous invoices, packing lists, and purchase orders for Graminex sales to Graminex Australia from 2007 to 2015 show "Cernilton Tablets" as the ordered product. The testimony at the evidentiary hearing confirmed that this activity "involved 'the negotiation and execution of contracts [and] agreements . . . that employ or relate . . . to [Cernelle's] registered trademarks." For example, Heather May testified that the invoices were prepared at the purchaser's request to help with customs. The district court's factual finding that Graminex's use of the trademarks was a component of making sales to overseas buyers was not clearly erroneous.

Graminex and May do not dispute this evidence that they used the trademarks. Instead, they argue that the district court's conclusion that this use amounts to breach of the Settlement

Agreement was legal error because Cernelle did not show damages from Graminex's use. Graminex and May conflate "injury" with "damages." The terms are not synonymous. *Cf. President of Mich. State Bank v. Hastings*, 1 Doug. 225, 256 (Mich. 1844) (drawing a conceptual distinction between injury and damages in explaining that "there can be no damages without an injury"). In applying Michigan law, we require a plaintiff to prove: "(1) a valid contract exists between the parties; (2) the terms of contract require the performance of certain actions; (3) a party violated the terms of the contract; and (4) the breach caused an injury to the aggrieved party." *Shaughnessy v. Interpublic Grp. of Cos., Inc.*, 506 F. App'x 369, 374 (6th Cir. 2012) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)). The Michigan Supreme Court's formulation of its own law more concisely states this standard: "[i]n a breach-of-contract action, an injured party may seek damages for an injury caused by another party's breach of a contractual obligation." *Wright v. Genesee Cnty.*, 934 N.W.2d 805, 810 (Mich. 2019). Michigan law presumes "some damage—at least nominal damage—from the breach of a contract" and infringement of a legal right. *4041-49 W. Maple Condo. Ass'n v. Countrywide Home Loans, Inc.*, 768 N.W.2d 88, 92 (Mich. Ct. App. 2009) (citing *Vandenberg v. Slagh*, 114 N.W. 72, 75 (1907)); *see also Wyatt v. Herring*, 51 N.W. 684, 685 (Mich. 1892). Therefore, injury from breach of contract does not require economic harm. *See Maple Condo Ass'n*, 768 N.W.2d at 92.

Graminex and May also argue that because Cernelle did not do business in any of the jurisdictions that Graminex made sales, Cernelle has not shown any impact from their sales or their use of Cernelle's trademarks. But quantifiable economic harm is not the only cognizable injury. *Cf. Thermatool Corp. v. Borzym*, 575 N.W.2d 334, 337 (Mich. Ct. App. 1998). Graminex's use of the marks could undermine Cernelle's goodwill embodied in the marks and unjustly enriched Graminex. *See Ameritech, Inc. v. Am. Info. Techs. Corp.* 811 F.2d 960, 964–65 (6th Cir. 1987)

The record supports the district court's conclusion that Graminex used the trademarks to make sales to companies who wished to avoid import restrictions. A plaintiff may be entitled to a portion of a defendant's profits where the evidence shows that some portion of those profits were attributable to the use of the plaintiff's mark, *see Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville*, 849 F.2d 1012, 1016 (6th Cir. 1988), meaning the injury arises from the misuse of the trademark itself. Injury is often simply the use of the trademark without the plaintiff's permission because a trademark, intangible as it may be, is a property interest. *See, e.g.*, *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, 320 F. App'x 341, 349 n.5 (6th Cir. 2009) (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30.10 (5th ed. 2020)). Graminex knowingly used Cernilton's trademarks despite the obvious prohibition in the Settlement Agreement. The district court did not abuse its discretion in concluding that Graminex breached the Settlement Agreement.

## B. Contempt of the Permanent Injunction

Because "[c]ontempt is serious," "courts must exercise the contempt sanction with caution and use '[t]he least possible power adequate to the proposed end.'" *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir. 2017) (quoting *United States v. Wilson*, 421 U.S. 309, 319 (1975)). Accordingly, a party seeking a civil contempt order must show "by clear and convincing evidence that the opposing party knowingly 'violated a definite and specific order of the court.'" *Id.* at 800 (quoting *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987)). A contempt order is reviewed under an abuse of discretion standard. *Elec. Workers Pension Tr. Fund of Loc. Union #58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003). "Under this standard, a district court's decision is to be afforded 'great deference'" and the reviewing court will reverse "only if the district court relied upon clearly erroneous findings of

fact, improperly applied the governing law, or used an erroneous legal standard." *Id.* (quoting *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997)). However, the prior order must be "clear and unambiguous" to support a finding of contempt, and the district court must resolve all ambiguities in favor of the party accused of contempt. *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 550 (6th Cir. 2006) (quoting *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996)).

This standard of review is slightly more complicated when the alleged contempt involves a failure to comply with a consent decree or stipulated permanent injunction. In cases involving the review of a district court order interpreting that court's prior consent decree, a form of "deferential de novo" review applies. *See Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 528 (6th Cir. 2012) (quoting *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371–72 (6th Cir. 1998)); *see also G.G. Marck & Assocs., Inc. v. Peng*, 309 F. App'x 928, 934 (6th Cir. 2009) (explaining that a "stipulated permanent injunction is a form of consent judgement"). Because "[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it," the district court's interpretation is a significant aid in construing the meaning of that decree. *Brown v. Neeb*, 644 F.2d 551, 558 n.12 (6th Cir. 1981).

This circuit considers consent decrees and stipulated permanent injunctions to be contracts, and therefore applies the substantive state law of the state in which they were entered to interpret them. *Engler*, 146 F.3d at 372. "Under Michigan law, '[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties.'" *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019) (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)). "A court 'must look for the intent of the parties in the

words used in the instrument.'" *Id.* (quoting *Mich. Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941)).

###### 1.     Graminex's Foreign Sales

The district court concluded that Graminex's sales to foreign distributors violated the court's Permanent Injunction because Graminex and May used Cernelle's names and trademarks on foreign shipping documents and invoices.  Graminex and May argue that this decision was an abuse of discretion because the plain language of the Permanent Injunction did not prohibit their conduct.  The Permanent Injunction, on their read, lacks "a clear and unequivocal command," *Gascho*, 875 F.3d at 800, prohibiting them from putting "CERNILTON" and "CERNITIN" on shipping and invoice documents sent to foreign distributors.  This debate over the meaning of the Permanent Injunction boils down to the interpretation of two sentences within that Order:

> [T]he defendants Graminex, L.L.C. and Cynthia May, and each of them, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from pledging or alienating the trademarks in dispute . . . .  This injunction is intended to prevent the negotiation and execution of contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, and plans that employ or relate in any manner to the registered trademarks and trademark applications, except as required by the parties' settlement of this litigation.

(R. 85, PageID 2036)  According to Graminex and May, only the first sentence of this paragraph directly constrains their actions.  They interpret the Injunction to prohibit only the "pledging or alienating of the trademarks in dispute," because only those terms directly follow the command that the defendants are "**RESTRAINED AND ENJOINED**."  The second sentence, they argue, is not its own command but merely a clarification of the scope of the first sentence's prohibition on pledging or alienating the trademarks.

Graminex and May's interpretation would constrain the injunction's reach. The "distinct and determinative legal meaning" of the word "pledge" is the "bailment of goods to a creditor as security for some debt or engagement." *United States v. Wright*, 60 F.3d 240, 241 & n.1 (6th Cir. 1995) (quoting Pledge, Black's Law Dictionary (4th ed. 1951)). To "alienate," in turn, is "[t]o transfer or convey (property or a property right) to another." Alienate, Black's Law Dictionary (11th ed. 2019). Applied to the second sentence, therefore, the injunction would prohibit only specific types of "agreements," "plans," or other actions related to the trademarks. For example, Graminex and May could not partially alienate a trademark through a licensing agreement. *See* Justin Hughes, *The Philosophy of Intellectual Property*, 77 Geo. L.J. 287, 346–47 (1988). Similarly, because a "plan" may be "a method for achieving an end," *Plan*, Merriam-Webster On-Line Dictionary, https://www.merriam-webster.com/dictionary/plan, Graminex and May would be enjoined from taking nascent steps to pledge or alienate the trademarks. Not covered, though, would be Graminex and May's agreements and plans using the disputed trademarks that do not pledge or alienate the trademarks themselves.

This reading would give scant force to the parties' stated intent in implementing a permanent injunction. Specifically, the injunction seeks "to prevent the negotiation and execution of contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, and plans that employ or relate in any manner to the registered trademarks" with only minor exceptions. Graminex and May's test of whether the sentence has "command language" overlooks that stated intent and would come close to instituting a punctuation rule: only if the language appears after the clear words "restrained and enjoined" and before a period could that language have force. Because "[h]onor[ing] the intent of the parties" is the central goal of contract

interpretation under Michigan law, we cannot write the second sentence out of the contract or hobble its effect so profoundly.

The rule for a clear command to hold a party in contempt is not as strict as Graminex and May would have it. While "[c]ontempt cannot be based on 'a decree too vague to be understood,'" *Gascho*, 875 F.3d at 800 (quoting *Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)), court orders need not delineate every possible violation to serve as the basis for a contempt order, *see McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949). The question is whether the party allegedly in contempt "fully understands [the order's] meaning but chooses to ignore its mandate." *Int'l Longshoremen's Ass'n*, 389 U.S. at 76. Where appellate courts have concluded that an order was too vague to support a contempt finding, the underlying orders were "unintelligible," *id.*, uncertain to even exist, *Reed v. Cleveland Bd. of Educ.*, 607 F.2d 749, 752 (6th Cir. 1979), or would have required a party to "gauge their conduct" according to related agreements such that they would "be forced to test their interpretation of that agreement through contempt proceedings," *S. Ohio Coal Co. v. United Mine Workers of Am.*, 551 F.2d 695, 711 (6th Cir. 1977). Both the Permanent Injunction itself and the record support that Graminex and May should have known and did know that use of Cernelle's marks would violate the court's order. The stated intent to "prevent . . . agreements . . . and plans that employ or relate in any manner to the registered trademarks and trademark applications," is not unintelligible or vague. Here, Graminex and May made "plans" and "agreements" that relied on the use of Cernelle's marks.

Using the district court's own interpretation as another tool for construing the Permanent Injunction—as is required under the deferential de novo standard—there is further reason to read the second sentence as offering its own command. The text supports that the second sentence adds

breadth to the *entire* Injunction, as the prohibition on the "negotiation and execution of contracts, agreements . . . licenses, and plans" sweeps in all such actions "that employ or relate in any manner to the registered trademarks." If only pledging and alienating were proscribed, the thrust of the second sentence would be difficult to understand because "in any manner" necessarily suggests broadening the scope of the existing language. To make the contract achieve the purpose described in the second sentence, it is therefore proper to read both sentences as having independent force.

Evidence of the Permanent Injunction's reach is also found in the procedural history. The district court's interlocutory preliminary injunction closely resembles the Permanent Injunction, except that the prohibition on pledging or alienating marks is separate from the paragraph stating the scope of the injunction. Rather than stating an intent for the injunction as a whole, the interlocutory preliminary injunction instead states that "the injunction described above encompasses" contracts, agreements, and the like. The preliminary injunction, in contrast, combines those sentences into a single paragraph and rewords the second sentence to state that "[t]his injunction is intended to prevent the negotiation and execution of contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, and plans that employ or relate in any manner to the registered trademarks and trademark applications." Based on this progression, it is reasonable to conclude that the district court intended to expand the second sentence's scope from a narrow reference to a statement about the entire injunction.

We are also wary of embracing Graminex and May's narrow interpretation given the Supreme Court's admonition against allowing parties to defy court orders through technicalities. *See McComb*, 336 U.S. at 192–93. A rule that a party has "immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined . . . . would give tremendous impetus to the program of experimentation with disobedience of the law." *Id.* at 192. Graminex

and May's view of the Permanent Injunction would have us impose a clear language rule so strict that it would leave our district courts compelled to issue orders full of hypotheticals for fear that enforceable contempt orders would otherwise be impossible. Our case law rejects such narrow constructions of consent decrees and stipulated injunctions. *Cf.*, *e.g.*, *Brown*, 644 F.2d at 558.

That the Russian company Graminex Pharma owns the Russian trademark for Cernilton does not change this conclusion even with respect to the Russian sales. Graminex and May used the Cernilton trademark in the United States when preparing the shipping labels and documentation. Courts have concluded in trademark infringement cases under the Lanham Act that a merchant labeling goods in the United States with an infringing mark and then shipping those goods for sale only in a foreign nation still may be committing trademark infringement because of the nexus to the United States. *See, e.g.*, *Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 701 F.2d 408, 414–16 (5th Cir. 1983); *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 327–28 (5th Cir. 2008); *McBee v. Delica Co.*, 417 F.3d 107, 111 (1st Cir. 2005). Graminex's actions in the United States are relevant. The record shows, moreover, that the use of that trademark was not necessarily meant for end consumers in Russia but rather to get the Graminex products past customs requirements. The Russian Federation had authorized the import of Cernilton, and the record supports the inference that Graminex lacked similar authorization. Cynthia May and Heather May testified that the use of Cernelle's marks on the shipping documentation was necessary according to their buyers. The district court did not commit a clear error in reaching its factual conclusion that Graminex planned to use the trademarks and negotiated and executed agreements related to those trademarks, namely by using the Cernelle trademarks at the behest of customers to secure sales. The district court did not abuse its discretion in concluding

that Graminex's use of the Cernelle trademarks for foreign sales was contempt of the Permanent Injunction.

### 2.  Graminex's Website

Graminex and May also argue that the district court abused its discretion in holding them in contempt of the Permanent Injunction based on the clinical studies about Cernilton and Cerniton-branded products that Graminex hosted on its website. According to Graminex and May, the district court abused its discretion in failing to explain why it rejected a comparative-advertising defense given that the court had earlier clarified that comparative advertising would not violate the Injunction. They argue that because the page hosting the links to these studies explicitly compares Cernilton with Graminex based on the former's use of solvents in the extraction process, the hosting of clinical studies elsewhere on that page is a continuation of that comparative advertising.

The Permanent Injunction limits Graminex's ability to use Cernelle's trademarks on its website, stating:

> the defendants Graminex, L.L.C. and Cynthia May, and each of them, the defendants, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from maintaining any website that is misleading as to its relationship with the plaintiff or that mentions the products CERNI-QUEEN®, CERNILTON®, POLLISPORT®, POLLEN STARK®, CERVITAL™, NAPOLEN GOLD™, CERNELLE®, and CERNITIN® in any way that suggests that Graminex is involved in the manufacture, development, or ownership of the products; and selling, promoting, or advertising products manufactured by A.B. Cernelle.

(R. 85, PageID 2037) The district court concluded that the presence of the Graminex logo on the linked clinical studies violated the Injunction because, although comparative advertising is permissible, the linked studies did not compare the products. Instead, the studies explained the

benefits of Cernilton and Cernitin for prostate health, and the Graminex logo signaled a link between the subject of that study and Graminex.

The record supports the district court's rejection of the comparative-advertising justification for the clinical studies. Although Graminex had comparative-advertising language on the page linking to the studies, the record suggests that those links would bring up the study in a separate page. This created a disconnect between the comparative advertising language and the clinical studies. Moreover, the studies themselves did not compare Graminex's products to Cernelle's products. Instead, the clinical studies merely explained the benefits of Cernelle's products.

As to whether the presence of the Graminex's logo on the studies was misleading about Graminex's relationship with the trademarked products, Graminex and May hang their argument largely on the dearth of evidence of consumer confusion. This definition of "misleading" significantly narrows the reach of the Permanent Injunction. *Cf.* Misleading, Black's Law Dictionary (11th ed. 2019) ("delusive, calculated to be misunderstood"). Given that the studies generally offer positive assessments of Cernelle's products, the presence of Graminex's logo on those studies does suggest that Graminex has some relationship with the products discussed in those studies. The district court did not abuse its discretion in finding this misleading.

C.     **Laches**

Graminex and May argued that dismissal of the enforcement motion is proper because Cernelle is guilty of laches. "Laches is the negligent and unintentional failure to protect one's rights." *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 584 (6th Cir. 2015) (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002)). It is an equitable defense that bars relief when a plaintiff sits on his or her rights and, in doing so,

disadvantages the other party's present defense against the claim. *See Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007). The district court rejected this defense, finding that Graminex and May had failed to show prejudice from the delay and that they had unclean hands.

If there is no dispute that laches could bar a particular claim, we review a district court's ruling on laches for an abuse of discretion. *Kehoe Component Sales Inc.*, 796 F.3d at 584. Because a motion to enforce a consent decree or stipulated permanent injunction seeks an equitable remedy, the defendant may raise equitable defenses such as laches. *McKeon Prods, Inc. v. Howard S. Leight & Assocs., Inc.*, 15 F.4th 736, 741 (6th Cir. 2021). Claims related to a stipulated order in a trademark dispute are no exception. *Id.* at 742.

The party asserting laches has the burden of proving (1) that the plaintiff lacked diligence in pursuing its claim and (2) that the party asserting laches suffered prejudice from this lack of diligence. *Id.* (citing *Chirco*, 474 F.3d at 231). "Delay alone cannot warrant laches." *Id.* (citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003)). The court must weigh that delay and the resulting prejudice to determine if the equities tip in favor of enforcing the laches doctrine. *See id.* At bottom, laches is "principally a question of the inequity of permitting a claim to be enforced." *Ford Motor Co.*, 342 F.3d at 550 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)).

Both parties challenge the district court's decision on laches. Cernelle asserts that the district court abused its discretion in concluding that it unreasonably delayed bringing its contempt motion. Graminex and May assert that the district court abused its discretion in not applying laches to bar Cernelle's claims because the record shows Cernelle unreasonably delayed its enforcement suit, which prejudiced them. They point to the district court's conclusion that Cernelle had not

offered a reasonable explanation for its failure to pursue its rights under the Settlement Agreement. According to Graminex and May, this delay resulted in the loss of emails, the absence of critical witnesses, and Graminex's continued investments in foreign distribution of its products.

The first question of unreasonable delay is straightforward. Cernelle challenges the district court's finding because it sought relief only for violations within six years of the contempt motion's filing. Although Cernelle did not have direct evidence of Graminex's foreign sales using the disputed trademarks until 2017, the applicable standard is constructive notice. *McKeon*, 15 F.4th at 743. Record evidence supports the district court's conclusion that Cernelle knew or should have known about Graminex's breaches of the Settlement Agreement before it filed the contempt motion in 2018. Over a decade earlier in 2006, Cernelle learned that Graminex had posted clinical studies discussing Cernilton and Cernitin on its website despite the Settlement Agreement. In 2008, Cernelle began monitoring its trademarks for third-party use and received a watch notice that Graminex Pharma had registered "cernilton" as a trademark in Russia. By 2013, the Cernelle Board received a report on the possible use of Cernelle trademarks on the Graminex website.[2] The board authorized its CEO to investigate Graminex's compliance in April 2017 and eventually brought its motion in August 2018. Given these hints that Graminex might have been involved in foreign sales of products labeled "Cernilton" and the more obvious use of Cernelle's trademarks on the Graminex website, the district court's finding of some unreasonable delay was not an abuse of discretion.

---

[2] By 2013, Cernelle's actions fall within the applicable statute of limitations for breach of contract claims in Michigan (six years), which provides a presumption of timeliness when considering laches. *See Nartron Corp*, 305 F.3d at 408. Therefore, it is not Cernelle's constructive knowledge in 2013 that is pertinent, but rather that the Cernelle Board had seemingly sought out this report possibly six years before it filed its contempt motion.

*McKeon Products, Inc. v. Howard S. Leight & Associates, Inc.*, is a helpful point of comparison. 15 F.4th at 742–45. In *McKeon*, this court rejected the application of laches to a plaintiff who had failed to sue the defendant for breach of a settlement agreement for years even though the defendant had been in breach for more than a decade. *Id.* at 739. The court explained that while the standard is constructive notice, the plaintiff was not responsible for policing all the defendant's actions. *Id.* at 743. Because the plaintiff "promptly emailed" its competitor to cease and desist upon discovering the breach and brought the lawsuit just six months later, we concluded that this was not sufficient delay to justify laches. *Id.* In contrast, Cernelle had reason to further investigate Graminex's use of its trademarks as early as 2006 when it found references to its products on Graminex's website. Despite concerns for over a decade, Cernelle did not promptly send a cease-and-desist letter, and the evidence suggests that it took over a year to investigate Graminex's use of the trademarks and file a contempt motion in 2018 even after these clues to Graminex's non-compliance.

As to prejudice to Graminex from this delay, the record shows little harm. Delay in and of itself can create prejudice "because potential damages increase during each year that the claimed mark is used," witness memories likely change, and the cost of defense increases. *Nartron Corp.,* 305 F.3d at 411–12. But here, Cernelle did not seek disgorgement for conduct beyond the presumptively reasonable six-year statute of limitations for breach of contract claims. *See id.* at 408; Mich. Comp. Laws § 600.5807(9). Graminex also did not meet its burden of proof to show that it made significant capital outlays in reliance on Cernelle's delay. Graminex's current CEO, Heather May, testified that the primary capital expense—a special machine dedicated to producing products for the Russian market—could be retooled. Graminex's general claim that documentary evidence and witnesses were lost due to the delay shows little prejudice either. The evidence

purportedly lost would not have gone to Graminex's defense against the contempt motion, but instead to support its argument on laches. *Cf. Chirco*, 474 F.3d at 231. It was not an abuse of discretion to conclude that Graminex and May's lack of evidence showing prejudice rebutted any presumption of prejudice from delay. *See McKeon Prods., Inc.*, 15 F.4th at 744 ("Merely stating prejudice, without showing how, is not enough.").

The secondary issue is whether the district court abused its discretion in recognizing unclean hands as an independent basis for not applying laches against Cernelle. "[B]ecause laches is an equitable defense, it is subject to the limitations imposed by the doctrine of unclean hands." *Osborn v. Griffin*, 865 F.3d 417, 451 (6th Cir. 2017). A court may, therefore, deny laches as relief where "the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Cyber Sols. Int'l, LLC v. Pro Mktg. Sales, Inc.*, 634 F. App'x 557, 567 (6th Cir. 2016) (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995)). The court reasoned that Graminex had acted in bad faith in using Cernelle's trademarks to sell products internationally and skirt import regulations in those countries after settling Cernelle's trademark infringement lawsuit. The court pointed to the record evidence that Cernelle had sought and received authorizations for its products in those countries and Graminex took advantage of that prior effort in making its foreign sales. Given the notice Graminex and May had of their obligation not to use the trademarks and the evidence supporting the inference that they used the trademarks to avoid customs obligations, the district court did not abuse its discretion in determining that Graminex's behavior made the application of laches inequitable.

**D.**     **Remedies**

1.  Profit Disgorgement

The district court ordered disgorgement of $535,854 in profits against Graminex and May based on their violations of the Permanent Injunction and Settlement Agreement.  Profit disgorgement is an equitable remedy that a party may seek for an intentional or reckless violation of a settlement agreement.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 39 (2010).  Disgorgement prevents a defendant from keeping "gains that the defendant would not have realized but for the breach."  *Id.* § 39(3); *see Chauffeurs, Teamster, & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570–71 (1990).  In other words, profit disgorgement "prevent[s] the unjust enrichment of the defendant at the expense of the plaintiff."  Restatement (Third) of Restitution and Unjust Enrichment § 39 cmt. a.  Disgorgement may also be used to "coerce future compliance with a court's order."  *Gnesys, Inc. v. Greene*, 437 F.3d 482, 493 (6th Cir. 2005) (quoting *Glover v. Johnson*, 199 F.3d 310, 313 (6th Cir. 1999)).

Both parties object to the district court's decision on disgorgement.  Graminex and May argue that the district court's disgorgement order as related to sales to the Russian distributor was legal error because the Russian distributor held the Russian Cernilton trademark.  They assert that because trademarks are territorial, the original Permanent Injunction can apply only to U.S. registrations.  Therefore, the sales to the trademark holder in another territory did not violate the Injunction, as Cernelle had no trademark rights in that territory.  But at issue here is whether Graminex had the right to breach the Agreement prohibiting it from using the trademark and trade names belonging to Cernelle.  In other words, Graminex Pharma's intellectual property in Russia does not supersede the Settlement Agreement's prohibition on Graminex's use of Cernelle's trademarks and trade names.  Graminex and May also overlook that many of the contemptuous

actions occurred in the United States: creating customs documentation using Cernelle's trademarks and making shipping labels using those trademarks. More importantly, damages for violations of a contempt order are used not only to compensate, but also to assure future compliance. *Gnesys, Inc.*, 437 F.3d at 493. Given the record evidence that the use of Cernelle's trademarks helped Graminex secure sales to the foreign distributors, the disgorgement of profits was not an abuse of discretion.

Cernelle objects to the district court's disgorgement decision because the district court granted it only three years rather than six years of disgorged profits. Cernelle argues that because the district court concluded that laches did not bar its contempt motion, there was no legal basis for the district court to limit the disgorgement period to three years. Disgorgement is an equitable remedy, which affords the district court considerable discretion to design the remedy to prevent unjust enrichment. *See Osborn*, 865 F.3d at 455; *see also SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). While Cernelle is correct that the district court concluded that laches did not bar the contempt motion, it also found that Cernelle had unreasonably delayed in filing its motion. More importantly, the district court found that equitable consideration tipped against disgorging a full six years of Graminex's profits from foreign sales because Cernelle had not taken steps to enter those foreign markets. Because the district court gave a reasoned explanation based in equity for its decision to limit disgorged profits and did not base this decision on legal error, the disgorgement decision was not an abuse of discretion.

### 2. Modification of the Remedial Permanent Injunction

After the district court entered judgment on Cernelle's contempt motion, Graminex and May requested that the district court reconsider the remedial Injunction. That Order enjoined the defendants from selling or transferring products to a customer that they "know or should know

uses in any way the trademarks listed in the permanent injunction." Graminex and May argued that the Injunction impermissibly expanded the scope of the permanent injunction entered pursuant to the Settlement Agreement. The district court granted that request based on its conclusion that it could not, as a matter of law, expand the Permanent Injunction's scope beyond what the parties had bargained for. Therefore, the court modified the remedial Injunction to replace "should know" with "reason to know," which it found hewed closer to the Settlement Agreement's scope. Cernelle argues that the district court's assertion that it could not expand the Injunction was legal error.

An order agreed upon by the parties is "essentially a consent decree," which is "subject to ongoing judicial review and 'must be construed to preserve the position for which the parties bargained.'" *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 924 (6th Cir. 2002) (quoting *Grand Traverse Band of Ottawa & Chippewa Indians v. Dir., Mich. Dep't of Nat. Res.*, 141 F.3d 635, 641 (6th Cir. 1998)). This protection against overbroad modification is necessary because "[a] consent decree is a strange hybrid in the law." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Brown*, 644 F.2d at 560). Consent decrees—and their counterparts like the stipulated Permanent Injunction at issue in this case—are both a voluntary settlement and a final judicial order, meaning that "the power and prestige of the court [is] behind the compromise struck by the parties." *Id.* (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). The scope of a consent decree is part of the settlement. Therefore, its reach "must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Firefighters Loc. Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971)); *see also Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992). "This court reviews a district court's modification of a

[stipulated permanent injunction] under an abuse of discretion standard." *Vanguards of Cleveland*, 23 F.3d at 1017.

The district court considered this limitation on its power to modify the stipulated Permanent Injunction and offered a reasoned analysis of why the term "should know" would impose obligations on Graminex and May absent in the original stipulated Permanent Injunction. Such language would give Graminex and May the duty "to use reasonable diligence to ascertain the existence of" a customer's use of Cernelle's trademarks before completing any sales. Restatement (Second) of Torts § 12 cmt. a (1965). In contrast, the term "reason to know" would impose liability only if Graminex or May had "knowledge of facts from which a reasonable man of ordinary intelligence . . . would either infer the existence" of that prohibited use "or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist." *Id.* The stipulated Permanent Injunction did not impose such a stringent duty; at its broadest it prohibited Graminex and May from participating in or making "plans that employ or relate in any manner to the registered trademarks." The district court's conclusion that "reason to know" was more faithful to the language and purpose of the stipulated Permanent Injunction reasonably interpreted the original Order and correctly applied the requirement that remedial orders must hew to the scope of consent decrees and similar stipulated orders.

## III.   CONCLUSION

Accordingly, we **AFFIRM** the district court's orders.